UNITED STATES of America

v.

Maximo GENAO, et al., Defendants.

No. 92 CR 510 (JSM).

United States District Court,
S.D. New York.

Aug. 25, 1993.

Robert Wolf, New York City, for Maximo Genao.

Telesforo DelValle, Jr., New York City, for Francisco Miguel Genao.

Joel Cohen, New York City, for Pedro Genao.

Marc Bogatin, New York City, for Franklin Vargas.

Martin Fogelson, New York City, for Anibal Abad.

Anthony Cueto, New York City, for Reinaldo Garcia.

James Neville, New York City, for Ramon Burgos.

Robert Koppelman, New York City, for Francis Liberato.

Donald Cameron, New York City, for Cesar Carmona.

David Goldstein, Bronx, NY, for Carlos Blanco.

Daniel Nobel, New York City, for Pedro Lara.

Joyce London, Kellman & London, Gino Singer, New York City, for Robert Llin, Jr.

## OPINION

MARTIN, District Judge:

In this case the Government is seeking to have the Court impose lengthy guideline and mandatory minimum sentences on relatively low-level drug dealers. The factual record before the Court clearly demonstrates the injustice that results from a system that has the sentence of a defendant predetermined by people who have never seen the defendant, know nothing of the defendant's background and are unaware of the particular factual circumstances of his crime.

The draconian sentences mandated for drug dealers are adopted to punish a stereotypical drug dealer, such as those described in the following excerpt from the Congressional record:

> They live in the fast lane. They drive big cars—usually several—like BMWs and Mercedeses.... They like gold. Big gold chains and big gold diamond rings.... They spend most of their money on themselves and their women.

134 Cong. Rec. S3127 (1988) (Sen. Graham).

While harsh mandatory minimum and guideline sentences are totally appropriate for such high-level drug dealers, they all too often are applied to people such as the defendants in this case whose lives are far from that described above.

Presently before the Court for sentencing are eight persons, including six immigrants—legal and illegal—from the Dominican Re-

public. For the most part, they came to this country not to sell drugs, but, like many immigrants before them, to seek a better life for themselves and their families. However, the economic opportunities that they hoped to find—indeed, legitimate jobs of any kind—were not available. As a result, they ultimately became involved in the drug operation of Maximo Genao. Theirs was not the glamorous life of the movie version of a narcotics dealer, but rather a life in which they worked long hours for rather meager pay. A good example is the defendant Pedro Lara.

Pedro Lara was born and raised in Villa Altagracia in the Dominican Republic. At age fifteen, he was forced to leave school to help support his family. Unable to earn a living in his own country, he learned of someone who was transporting people to Puerto Rico on a raft so that they could enter the United States illegally. Once in the United States, he found little opportunity for legitimate employment so he took a job working at a crack spot owned by Maximo Genao, an acquaintance from Villa Altagracia.

For approximately six and one-half months, Lara worked twelve hours a day, six days a week and was paid $500 per week (or $6.95 per hour) for his efforts. While there is a semantic dispute as to whether Lara should be considered a "manager" of the spot or a "look out", there is no substantial dispute as to what his role was. Lara took bundles of crack prepared by other members of Genao's organization, delivered them to "pitchers" who sold them on the street, looked out for the cops while the sales were taking place, and then collected the proceeds from the pitchers and delivered them to another member of Genao's organization.

On the basis of this conduct, the pre-sentence report presently before the Court calculates Pedro Lara's offense level under the Sentencing Guidelines as 38, which would require the Court to sentence Pedro Lara to jail for 19 years and 7 months. There can be no parole.

While no one, not even the defendant,[1] disputes that Pedro Lara should be sen-

---

1. At trial Lara testified, "I want to be punished for my things, for what I did."

tenced to a substantial prison sentence, I find it impossible to believe that any rational person could say that justice will be done if Pedro Lara is sentenced to a prison term that is greater than that served by most convicted murderers in New York State [2] and is over six times the sentence imposed on Ivan Boesky, a multimillionaire who, out of pure greed, engaged in massive fraud over a period of years.

Yet the Sentencing Guidelines instruct me that in imposing sentence on Pedro Lara, I may not consider his educational or vocational skills (§ 5H1.2) or his socio-economic background (§ 5H1.10).

Although the Guidelines strip the Court of the power to consider such seemingly relevant background facts because the Commission expressly considered and rejected those factors, the sentencing judge is not relegated to the role of a complete automaton. Congress has empowered district judges to depart from the sentence computed under the Guidelines if the Court finds on the facts presented to it "that there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that should result in a sentence different from that described." 18 U.S.C. § 3553(b). There is such a circumstance here.

In formulating the guidelines for narcotics offenses, the Sentencing Commission places its overwhelming emphasis on the quantity of drugs involved in the offender's crime. Thus, a defendant who participates in transactions involving 1,500 kilograms or more of cocaine would have a base offense level of 42 which without adjustment would result in a sentencing range of from 20 years to life, while an offender who sold less than 25 grams of cocaine would have a base offense level of 12 resulting in a sentence of 10 to 16 months. *See* Guidelines § 2D1.1(a)(3), § 5A.

While the Guidelines focus on the quantity of drugs distributed by a defendant, they do not consider at all whether, in assessing the culpability of the defendant's conduct, one should give any consideration to the quantity of narcotics in which they defendant dealt at any one time. Anyone familiar with narcotics distribution in our society would have to agree that those who deal in kilogram quantities of narcotics are more culpable than the street peddler who sells $10 bags. Yet under the Guidelines, a dealer caught selling a kilogram of cocaine on a single occasion would receive the same sentence as a street vendor who admitted to an undercover agent that he had sold 25 grams of cocaine a day while working on the same street corner for about seven weeks.

Nothing in the Guidelines, policy statements or official commentary of the Sentencing Commission indicate that the Sentencing Commission adequately considered the relationship between the amount of narcotics distributed by a defendant and the length of time it took the defendant to accomplish the distribution.

Even though I have served for only three years as a Judge of this Court, it is obvious to me that in imposing sentence the Court in most cases is looking only at a snapshot of a defendant's criminal activity. In most narcotics cases there are one or two undercover buys followed by an arrest. No reasonable person would assume that all of these defendants were simply unlucky enough to get caught the first time they became involved in narcotics. To the contrary, these defendants have usually been targeted by law enforcement because informants have identified them as regular drug dealers.

In other cases, such as the one presently before the Court, investigations which target relatively major players within the overall scheme of drug dealing are extended for substantial periods of time in order to obtain wiretap and other types of evidence on the major drug dealers involved. At the time of sentencing, therefore, we have a much larger picture of the activities of the defendants, and, therefore, the quantity of drugs involved is vastly increased.

---

**2.** From 1987 to 1991, convicted murderers in New York served an average of 183.3 months, or approximately 15 years and 3 months, before being released. New York Dep't of Correctional Services, Characteristics of Inmates Discharged 1991 17 (1991).

Here, for example, Pedro Lara, who was never personally involved with the distribution of more than 25 grams of crack on any one day, finds that the Government is arguing that he should be sentenced for participating in the distribution of 7.3 kilograms of crack allegedly sold from the crack spot where he worked during the seven-month period of his involvement. Thus, in the Government's view, Lara would start at a base offense level of 40 (292 to 365 months), although the base offense level for selling 25 grams of crack would be 28 (78 to 97 months).

It is instructive to compare Lara's guideline range with that of a defendant in an unrelated case, Richard Rodriguez, whose pre-sentence report is presently before the Court. Rodriguez and his co-defendant met with undercover agents several times during a two-month period in the fall of 1992. During that time period, they made the following drug sales:

1. September 24, 1992—34 vials and one small bag of crack for $220.

2. October 7, 1992—Two "rocks" of crack for $200.

3. October 20, 1992—187 vials of crack for $600.

4. November, 1992—88 vials of crack for $300.

In addition, on October 22, 1992, Rodriguez sold the undercover agent a nine-millimeter Rueger pistol for $800 and on November 19, 1992, Rodriguez sold the undercover agent a Smith & Wesson .22–caliber revolver and a Jennings .22–caliber semiautomatic pistol and three boxes of ammunition.

While no one would characterize Rodriguez as a major drug dealer, certainly he played a more substantial role in the overall scheme of crack distribution than did Lara and his activities were compounded by his illegal sales of three guns and ammunition. Yet while Lara's pre-sentence report places his minimum guideline range at 235 months, Rodriguez's pre-sentence report places his minimum guideline range at 60 months. There is no rational basis on which to justify such a disparity.

In my view, the above analysis compels the conclusion that the fact that the total quantity of drugs chargeable to a particular defendant was distributed over a substantial period of time is a mitigating factor not adequately taken into consideration by the Sentencing Commission. Indeed, nowhere in the Guidelines, the policy statements or the official commentary is there any reference to the need to weigh the relationship between the quantity of drugs distributed and the time it took to distribute them.

■ This issue was raised, however, by proposed amendments to the Sentencing Guidelines which the Commission did not adopt. The following proposed amendments offered two alternative ways of addressing this issue:

§ 2D1.1 *Unlawful Manufacturing, Importing, Exporting, Trafficking, or Possession (Including Possession with Intent to Commit These Offenses); Attempt or Conspiracy*

*Option 1*

\* \* \* \* \* \*

(3) the offense level specified in the Drug Quantity Table set forth in subsection (c) below. Where the offense involved a number of transactions, the offense level is to be limited by the amount of the largest single quantity with which the defendant was involved at any one time. *Provided,* that if any single quantity with which the defendant was involved corresponds to level 32 or greater, the above limitation does not apply and all quantities involved in the offense are to be aggregated.

\* \* \* \* \* \*

*Option 2*

(3) the offense level specified in the Drug Quantity Table set forth in subsection (c) below. Where the offense involved a number of transactions over a period of time of more than thirty days, the offense level is to be limited by the amount with which the defendant was involved at any thirty-day period, using the thirty-day period that results in the greatest offense level. *Provided,* that if

any single amount with which the defendant was involved corresponds to offense level 32 or greater, the above time limitation does not apply and all quantities involved in the offense are to be aggregated.

57 Fed.Reg. 62,832 (proposed Dec. 31, 1992). However, neither of these proposals were adopted when the Commission actually amended the Guidelines in May 1993 (subject to Congressional review). *See* 58 Fed.Reg. 27,148 (1993).

18 U.S.C. § 3553(b) precludes the Court from considering the fact that these amendments were before the Commission in determining whether the Commission adequately considered this issue. In considering whether the Commission adequately took a factor into consideration, a district court is to consider "only the sentencing guidelines, policy statements, and official commentary of the Sentencing Commission." *Id.* This limitation on materials a court may consider has been explicitly reiterated by the Courts of Appeals. *See, e.g. United States v. Luscier,* 983 F.2d 1507, 1510 (9th Cir.1993); *United States v. Shetterly,* 971 F.2d 67, 76 (7th Cir. 1992); *United States v. Williams,* 948 F.2d 706, 708 (11th Cir.1991); *United States v. Feinman,* 930 F.2d 495, 501 (6th Cir.1991); *United States v. Fousek,* 912 F.2d 979, 981 (8th Cir.1990).

A proposed amendment is not a "sentencing guideline[ ], policy statement[ ], [or] official commentary," and thus can not be considered by a court in determining whether the Commission took a factor into account. *See United States v. Restrepo,* 802 F.Supp. 781, 786–87 (E.D.N.Y.1992), *vacated on other grounds,* 999 F.2d 640 (2d Cir.1993). The court's scrutiny is properly limited to such materials because only they are "the official pronouncements of the Commission." 133 Cong.Rec. S16644 (daily ed. Nov. 20, 1987) (Sen. Kennedy). "Even though minutes of Commission meetings, other Commission records, or testimony of a member of the Commission might indicate that a circumstance was adequately considered in the formulation of the guidelines, the court cannot consider such minutes, records or testimony." 133 Cong.Rec. H10014 (daily ed. Nov.

16, 1987). "Clearly, Congress never intended that the sentencing court would look to items other than the guidelines, policy statements and the Commission's official commentary in determining what the Commission has adequately considered." 133 Cong. Rec S16644 (daily ed. Nov. 20, 1987) (Sen. Kennedy); *cf. United States v. Ryan,* 866 F.2d 604, 608 n. 8 (3d Cir.1989) (recognizing possibility that § 3553(b) prevents courts from considering simple "update" from Commission because it is not part of the "sentencing guidelines, policy statements and official commentary").

There are sound policy reasons why the Commission's failure to pursue the proposed amendments should not be considered. As the Second Circuit and other courts have recognized in considering Congress' failure to enact legislation, inaction should not be taken as evidence that a promulgating body has fully considered an issue and intended the opposite result:

[W]e take issue with those who find guidance in congressional inaction. Congress acts only by affirmatively passing laws, a process which requires the concurrence of both Houses, and, in most instances, the approval of the President. Admittedly, in interpreting an enacted provision, it may be appropriate to review the legislative history or the measure, including provisions that were earlier rejected. There, of course, one is merely determining congressional intent as embodied in positive law. Nothing in this principle, however suggests that legislative silence can in any way be viewed as an expression of congressional "intent,".... As the Supreme Court has observed, "[t]he search for significance in the silence of Congress is too often the pursuit of a mirage." *Scripps–Howard Radio v. FCC,* 316 U.S. 4, 11, 62 S. Ct. 875, 880, 86 L.Ed. 1229 (1942).

*Turpin v. Mailet,* 579 F.2d 152, 163 (2d Cir.) (footnote omitted), *vacated and remanded,* 439 U.S. 974, 99 S.Ct. 554, 58 L.Ed.2d 645 (1978), *prior decision reinstated,* 591 F.2d 426 (1979); *see Mayburg v. Secretary of Health and Human Servs.,* 740 F.2d 100, 104 (1st Cir.1984) ("[i]t is a mistake to equate congressional failure to act with congressional action"); *cf. United States v. Capital Blue*

*Cross,* 992 F.2d 1270, 1276 (3d Cir.1993) ("[a]s a general rule, Congress' rejection of a proposed amendment is not a significant aid in interpreting a statute passed years earlier"). Similarly, the failure of the Sentencing Commission to amend the Guidelines as proposed is not indicative of any intent or consideration on its part. In fact, the argument is even stronger as regards the Commission, in that, unlike Congress, its proceedings and deliberations are not available for review, and thus there is no way to determine why a particular proposal was not adopted. *See infra.*

Even if the Court were permitted to consider the fact that the Sentencing Commission did not adopt the proposed amendments, that fact would not indicate that departure on this ground is inappropriate. As the Guidelines themselves indicate, the Commission anticipated that the Courts would depart in appropriate cases and that such departures could provide a basis for amending the Guidelines. Thus, in the introduction to the Guidelines, the Commission states:

> By monitoring when courts depart from the guidelines and by analyzing their stated reasons for doing so and court decisions with references thereto, the Commission, over time, will be able to refine the guidelines to specify more precisely when departures should and should not be permitted.

*See United States v. Rivera,* 994 F.2d 942 (1st Cir.1993).

It may well be that the Commission determined that, rather than adopt the proposed amendments, it would be wise to defer action on this issue until sentencing courts faced with a variety of factual situations had addressed the issue through the departure process. Hopefully, this opinion will be of some use in such future consideration of the issue by the Commission.

Although the proposed amendments cannot be used in determining the propriety of departure, they do suggest that there are rational solutions for a problem that the Court concludes was not adequately considered by the Sentencing Commission. In the

Court's view, however, neither of the two approaches set forth in the proposed amendments appears to be appropriate for use in all situations.

In the case of a street-level dealer, the quantity of drugs distributed in any one day could be considered an appropriate measure of the impact of his activity on the claim of narcotics distribution. It is reasonable to assume that, absent some extraordinary circumstances, a street-level drug dealer will distribute similar quantities of drugs each day. However, it seems more appropriate to look at some longer period such as a week to distinguish those who distribute drugs on a regular basis from those who engage in such conduct only sporadically.

For one involved at a higher level of distribution, however, a single day's or week's activity may not accurately reflect the impact of that defendant's activity on the chain of distribution. At these higher levels, the availability of drugs at any one time, as well as the opportunity for sales, will vary. Thus, for such dealers it would appear more rational to assess their culpability on the basis of the quantity of narcotics distributed over a longer period of time. For example, a drug dealer who on an almost daily basis sells one kilogram of cocaine may be a more substantial supplier than a dealer who sporadically has the ability to sell larger amounts. Thus, in many cases, looking at the greatest amount distributed on a single day or in a single week will not adequately reflect the seriousness of the defendant's conduct. In such cases, it might be better to consider the total quantity sold in any one-month period.[3]

In any event, the Court is not called on here to redraft the Guidelines but rather to determine the appropriate level of departure from the applicable guideline ranges for the defendants before the Court in order to adjust for the mitigating factor which the Court has determined was not adequately considered by the Sentencing Commission. The adjustments will have to be individualized to

---

3. Of course, if different time periods were used to measure the quantity of drugs involved, it might be necessary to adjust the quantity tables set forth in the Guidelines to recognize these factors.

account for the different factual situations presented by the case of each defendant.

In view of the fact that in making these departures the Court is establishing offense levels that are different from those used in the presentence report, it seems appropriate to set forth in this opinion the Court's tentative conclusion as to the appropriate offense level subject to change after the Court hears the argument of counsel at the time of sentencing.

Since the pre-sentence reports were not prepared with the above analysis in mind, there is, as to some of the defendants, a lack of sufficient data to make the appropriate guideline calculation, and, where that is noted, the Government and the defendant are to submit, within ten days of the date of this opinion, letters setting forth their view of the appropriate guideline calculations.

*Pedro Lara*

 Lara was tried before the Court, and, therefore, all of the facts relevant to his sentencing are well known to the Court. As indicated above, Lara worked at the 174th Street crack spot owned by Maximo Genao. For reasons set forth above, the Court believes that a one-week time period is the most appropriate time frame to use to measure culpability of someone like Lara who was engaged in street distribution on a daily basis. The Government has presented evidence that indicates that approximately 280 grams of crack were sold per week at the spot were Pedro Lara was employed.

The distribution of 280 grams of crack would set Lara's offense level at 34 which covers the distribution of between 150 and 500 grams. Lara notes, however, that the Government's figure of 280 grams is based upon the amount of crack sold at that location in a full 24–hour–a–day, six-day-a-week period. Lara argues that he should only be held accountable for half of that amount, since as an employee at the spot he should only be accountable for the crack sold during his shift. This raises a question of the interpretation of § 1B1.3(a)(1)(B) which makes a person engaged in a jointly undertaken criminal activity responsible for "all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity."

Here, Lara argues that he was a mere employee and therefore had no interest in and connection with the crack distribution that took place when he was not working at the spot. The Government for its part argues that the crack spot depended for its operations on all employees, and therefore, Lara should be said to have jointly participated with all who worked at the spot.

The issue appears to be of little practical significance. Under the Government's view, Lara's responsibility for 280 grams places him at offense level 34. As the Government concedes, Lara is entitled to a two-point reduction for acceptance of responsibility taking him to a level of 32 which would provide a sentencing range of 121 to 151 months. Since there is a minimum ten-year sentence that must be imposed by statute, 21 U.S.C. § 841(b)(1)(A), and the Court would not be inclined to go above the minimum guideline range, a decision in Lara's favor on this issue would only reduce his sentence by one month.

Although one month is a relatively short period of time, to one incarcerated it is not insignificant. Therefore, the Court must resolve the dispute between the parties.

While the issue is a close one, it appears Lara's position is the more reasonable one. As the Government has acknowledged in this case, it would not be appropriate under § 1B1.3(a)(1)(B) to charge someone who worked out of Genao's 174th Street spot with crack distributed by other Genao employees at his Minford Avenue spot. It seems equally inappropriate to charge a group of Genao's employees who worked the day shift at 174th Street with the crack sold by other Genao employees during the night shift since they derived no benefit from that activity. Therefore, the Court concludes that it is appropriate to charge Lara with only one-half of the weekly amount sold at the 174th Street spot, to wit, 140 grams of crack. This would make his base offense level 32, and with a two-point reduction for acceptance of responsibility, his offense level would be 30 with a guideline range of 97 to 121 months. The sentence will have to be 120 months because

of the ten-year mandatory minimum provided by the statute.

### Franklin Vargas

Vargas was selling approximately 150 grams a week of cocaine at the Berimax grocery store operated by Maximo Genao. Since the Court finds a one-week period appropriate for judging the culpability of Vargas in the scheme of cocaine distribution, Vargas's base offense level would be 18 and with a three-point reduction for acceptance of responsibility his offense level would be reduced to 15, providing a sentencing guideline range of 18 to 24 months. The Government contends, however, that Vargas also passed along messages regarding Genao's crack and heroin deals. The pre-sentence report, however, does not attribute any of the heroin or crack to Vargas for the purpose of the guideline calculation, and the Court will consider additional submissions by the parties with respect to that issue.

### Ramon Burgos

Although Burgos served a role similar to that of Pedro Lara but at Genao's Minford Avenue crack spot, there is a dispute between Burgos and the Government as to his role. Therefore, the issue of the appropriate offense level for his conduct shall be reserved pending further proceedings with respect to him.

### Cesar Carmona

Cesar Carmona worked in the Berimax grocery selling cocaine. Thus, he would be liable for distributing 150 grams of cocaine per week which, in the Court's view, is the appropriate time period to measure his culpability. This would make his offense level 18 and with a three-point credit for accepting responsibility his offense level would be 15 providing a guideline range of 18 to 24 months. There is, however, in Carmona's case a mandatory minimum sentence of five years that must be imposed. 21 U.S.C. § 841(b)(1)(B).

### Francis Liberato

Like Carmona, Liberato also worked in the Berimax grocery store selling 150 grams of cocaine per week and would have the same guideline calculation as well as the same mandatory minimum sentence.

### Carlos Blanco

Blanco has entered into a plea agreement and stipulation with the Government which places his minimum guideline range below the mandatory minimum, and therefore the mandatory minimum will have to be imposed in this case.

### Anabal Abad

Abad apparently purchased quantities of heroin for distribution from some of Genao's suppliers. The Government has entered into a guideline stipulation with Abad, but the Court does not have sufficient information to make a judgment as to the guideline calculation that would be appropriate in light of this decision and therefore further submissions will be considered.

### Reginaldo Garcia

The information before the Court is not sufficient for the Court to make a guideline calculation in accordance with this decision, and therefore additional submissions will be considered.

### Conclusion

In the above opinion, the Court has attempted to apply the Sentencing Guidelines in accordance with the dictates of Congress and the rules set forth by the Sentencing Commission. Although the Court has departed from the Guidelines because it found that there was a factor present that was not adequately considered by the Commission, the Court has attempted to arrive at a guideline calculation that is consistent with the principles set forth by the Commission. Thus, the guideline ranges which have been set forth herein are more severe than the sentences that the Court would impose if the matter were left to the Court's discretion. Moreover, the guideline ranges appear in the end to be of no consequence since the defendants are subject to more severe mandatory minimum sentences.

In my judgment the sentences to be imposed on these defendants are not commensurate with their culpability. For example, the mandatory sentence for Pedro Lara of ten years in prison, with no parole, is too severe. Lara certainly deserves to be pun-

ished. Indeed, prior to trial Lara was willing to plead guilty if the Government would agree to a six-year sentence. Because of its view as to the appropriate guideline range, the Government could not agree to this disposition. In my view, Lara's sense of justice is, in this instance, more accurate than that of the Congress that adopted the mandatory minimum sentence that the Court must impose.

Thirty years ago when I started my career as a prosecutor, the typical mandatory minimum sentence provided for narcotics offenses was five years. Increasing the mandatory minimum sentences to today's levels has obviously not had any impact on the sale and distribution of narcotics in this country.

More often than not, the poor and uneducated, like Pedro Lara and his co-defendants, are made to pay the price for Congress' frustration at the inability of our law enforcement agencies to stem the rampant distribution of illegal drugs. Sending street-level drug dealers like Pedro Lara to jail for ten years will have no impact on the drug problem in this country. It does, however, reflect poorly on our system of justice.

Can we really say we have a rational system of justice when the court, in imposing sentence, is stripped of the power to even consider the socio-economic and educational background of the defendant? Can we honestly say that Pedro Lara's role in the distribution of narcotics requires a ten-year jail sentence without parole, when the Government candidly admitted that there was no attempt to prosecute the "pitchers", who worked at the level of distribution just below Lara, because their role in the chain of crack distribution was too insignificant to warrant prosecution?

As noted at the outset, no one questions the wisdom of imposing long prison sentences on major drug dealers like Maximo Genao. It was Maximo who ran the operation and made the big money. Ironically, Maximo persuaded the Government to release him on bail and has now fled back to the Dominican Republic. It is hard to believe that Pedro Lara's respect for our system of justice will grow as he spends ten years in jail while Maximo Genao enjoys the fruits of his drug dealing in the Dominican Republic. But this too is a factor that I am precluded from taking into consideration in imposing sentence on these defendants.