47 F.3d 60
 63 USLW 2543, 7 Fed.Sent.R. 159
 UNITED STATES of America, Appellee-Cross-Appellant,
v.
Pedro LARA and Ramon Burgos, Defendants-Appellants-Cross-Appellees,
Anibal Abad, Defendant-Cross-Appellee.
 Nos. 116, 32, 33, 247, 248, 249, Dockets 93-1750, 93-1773,
93-1780, 93-1794, 93-1795, 93-1837.
 United States Court of Appeals,
Second Circuit.
 Argued Nov. 14, 1994.
Decided Feb. 2, 1995.
 
 Gerard E. Lynch, New York City (Steven R. Peikin, Howard, Darby & Levin, on the brief), for defendant-appellant-cross-appellee Lara.
 Martin G. Fogelson, New York City, for defendant-cross-appellee Abad.
 James C. Neville, New York City, submitted a brief for defendant-appellant-cross-appellee Burgos.
 Michael S. Sommer, Asst. U.S. Atty., New York City (Mary Jo White, U.S. Atty., Paul G. Gardephe, Asst. U.S. Atty., on the brief), for appellee-cross-appellant.
 Before: NEWMAN, Chief Judge, ALTIMARI and LEVAL, Circuit Judges.
 JON O. NEWMAN, Chief Judge:
 
 
 1
 This appeal and cross-appeal in a narcotics case concerns primarily a novel and narrow issue arising under the Sentencing Guidelines. The issue is whether a sentencing judge may depart downward from the applicable guideline range because the aggregate quantity of narcotics attributable to the defendant, assessed in light of the time period during which the quantity was distributed and the small quantities distributed at any one time, overstates the defendant's culpability. The issue arises on an appeal by Pedro Lara and a cross-appeal by the United States from the October 26, 1993, judgments of conviction entered against Lara, Ramon Burgos, and Anibal Abad in the District Court for the Southern District of New York (John S. Martin, Judge).
 
 
 2
 We conclude that, at least prior to November 1, 1993, the circumstances relied on by the sentencing judge, as applied to Lara and Burgos, had not been adequately considered by the Sentencing Commission and permitted a departure for them, but not for Abad. On Lara's appeal, we affirm; on the cross-appeal, we affirm as to Lara and Burgos, and remand as to Abad.
 
 Facts
 
 3
 The offenses. Lara, Burgos, and Abad were charged in a superseding indictment with conspiracy to distribute drugs, in violation of 21 U.S.C. Sec. 846; Lara and Burgos were charged with the substantive offense of distributing more than 50 grams of crack, in violation of 21 U.S.C. Secs. 841(a)(1), (b)(1)(A), and 18 U.S.C. Sec. 2; and Abad was charged with the substantive offense of distributing a detectable amount of heroin, in violation of 21 U.S.C. Secs. 812, 841(a)(1), (b)(1)(C), and 18 U.S.C. Sec. 2. The charges stemmed from an organized cocaine and heroin distribution operation run by Maximo, Miguel, and Pedro Genao. The Genao brothers ran the operation at three locations in the Bronx from 1990 to mid-1992, one at East 174th Street, one at Minford Street, and one at Boston Road. Lara was employed at the East 174th Street location, and Burgos was employed initially at the Boston Road location and later at the Minford Street location. Abad was a wholesale customer of the Genaos, who purchased heroin for his own distributions.
 
 
 4
 The 174th Street location operated 24 hours a day, seven days a week, distributing primarily crack cocaine. Lara worked there 12 hours a day, six days a week, at a salary of $500 per week. During the six to seven months of his employment, the outlet sold 1,200 vials of crack each day. Each vial contained approximately .04 grams of crack. In that time period, more than 200,000 vials were sold, a quantity in excess of 8.5 kilograms that produced gross revenue of more than $545,000. During the three months that Burgos worked at the Boston Road location, 1.5 to 2 kilograms of powder cocaine were sold there. In the two subsequent months that he worked at the Minford Street location, which operated six nights a week and all day Sunday, the outlet sold between 800 to 1,000 vials of crack each day. While Burgos worked there, approximately 50,000 vials of crack were sold, a quantity in excess of 2 kilograms that produced gross revenue of more than $120,000. The duties of Lara and Burgos included collecting pre-packaged bundles of vials of crack from the Genaos, transporting the bundles to the distribution outlets, distributing the bundles to street sellers ("pitchers"), collecting proceeds from the pitchers, and delivering the proceeds to the Genaos.
 
 
 5
 Pleas and trial. Prior to trial, Abad pled guilty to the substantive heroin distribution count, and acknowledged obtaining from Maximo Genao and later selling four ounces of heroin. During the trial of Lara and Burgos, the latter pled guilty to the conspiracy count. The trial continued with Lara as the sole defendant. The Government presented overwhelming proof of his guilt. Testifying in his defense, Lara acknowledged every essential aspect of the activities he was alleged to have carried out, disputing only that his role had lasted seven months, as the Government's evidence indicated, rather than six months, as he contended.
 
 
 6
 During jury deliberations, the jury asked the trial judge again to define conspiracy. Judge Martin responded with an explanation framed in terms of the facts shown by the evidence in Lara's case. Pertinent passages are included in the margin.[1] Lara objected that the supplemental instruction had included reference to the specific facts of the case. The jury convicted on both the conspiracy and substantive counts.
 
 
 7
 Sentencing. Prior to sentencing, Judge Martin asked the parties to brief the issue of whether the Sentencing Commission, in formulating the drug-quantity table, U.S.S.G. Sec. 2D1.1(c), had adequately considered the period of time during which the defendant had distributed the narcotics attributable to him under the Guidelines. Thereafter, in a written opinion, United States v. Genao, 831 F.Supp. 246 (S.D.N.Y.1993), the Judge thoughtfully elaborated upon what might be characterized as the "quantity/time factor"--what the Judge explained as "the relationship between the amount of narcotics distributed by a defendant and the length of time it took the defendant to accomplish the distribution." Id. at 248. Judge Martin started from the premise that Congress authorized severe sentences for those dealing in large quantities of narcotics in order to provide justified punishments for "stereotypical drug dealer[s]," those described in congressional debate as the ones who " 'live in the fast lane ... drive big cars--usually several--like BMWs and Mercedeses ... [and] like ... [b]ig gold chains and big gold [and] diamond rings.' " Id. at 247 (quoting 134 Cong.Rec. S3127 (1988) (remarks of Senator Graham)).
 
 
 8
 He then noted that the Guidelines correlate narcotics sentences closely with the quantity of drugs that a defendant either distributes personally or for which he is accountable as "relevant conduct," U.S.S.G. Sec. 1B1.3. Expressing the view that "[a]nyone familiar with narcotics distribution in our society would have to agree that those who deal in kilogram quantities of narcotics are more culpable than the street peddler who sells $10 bags," he then noted that "under the Guidelines, a dealer caught selling a kilogram of cocaine on a single occasion would receive the same sentence as a street vendor who admitted to an undercover agent that he had sold 25 grams of cocaine a day while working on the same street corner for about seven weeks." Genao, 831 F.Supp. at 248. These observations led Judge Martin to consider whether the "quantity/time factor" was a factor that had not been "adequately taken into consideration by the Sentencing Commission in formulating the guidelines," 18 U.S.C. Sec. 3553(b) (1988), and therefore permitted a downward departure. He concluded that nothing in the Guidelines, policy statements, or official commentary indicated that the Commission had adequately considered the "quantity/time factor."[2]
 
 
 9
 Judge Martin next endeavored to construct a coherent approach for applying the "quantity/time factor" in order to determine the appropriate extent of a departure. His premise for this aspect of the analysis was that, as to defendants for whom the aggregate quantity of narcotics overstated culpability, the appropriate time period that would correlate culpability (and hence punishment) with drug quantity should vary depending on the defendant's role. Thus, he suggested, the appropriate period for a sporadic street-level dealer might be one day, for a more regular distributor, one week, and for those involved at higher levels of a narcotics operation, one month.
 
 
 10
 Before applying this approach to the three defendants, Judge Martin was confronted with presentence reports that determined the aggregate quantities that would be attributable to the defendants, without any departure. These quantities were: for Lara, 7 kilograms of crack, yielding an adjusted offense level of 38 and a minimum guideline sentence of nineteen years and seven months; for Burgos, 2-3 kilograms of crack, yielding an adjusted offense level of 36 and a minimum sentence of fifteen years and eight months; and for Abad, 4 ounces of heroin, yielding an adjusted offense level of 24 and a minimum guideline sentence of fifty-one months.[3] Implicitly concluding that the use of the aggregate quantities attributable to all three defendants overstated their culpability, Judge Martin then implemented his approach to the "quantity/time factor" and determined that the appropriate time interval for Lara and Burgos was one week, and for Abad, one month.
 
 
 11
 With respect to Lara, the Judge took the 280 grams that the Government's evidence showed had been distributed at his location each week and divided by two to reflect Lara's employment for a 12-hour shift at a 24-hour-a-day location. The resulting 140-gram quantity yielded a departure-based offense level of 30 (32 minus 2 for acceptance of responsibility) and a sentencing range of eight years and one month to ten years and one month. Since Lara was subject, in any event, to a mandatory minimum ten-year sentence, he was sentenced to ten years. With respect to Burgos, the Judge determined that the per-week quantity attributable to him was 280-375 grams, which yielded a departure-based offense level of 32 (34 minus 2 for acceptance of responsibility) and a sentencing range of ten years and one month to twelve years and seven months. The Judge apparently rounded off the minimum of the departure-based guideline range to equal the mandatory minimum sentence and sentenced Burgos to ten years.
 
 
 12
 Turning to Abad, who had made four one-ounce purchases of heroin for resale during a four-month period, Judge Martin took the one-ounce quantity (28.35 grams) attributable to Abad per month, which yielded a departure-based offense level of 16 (18 minus 2 for acceptance of responsibility) and a sentencing range of twenty-one to twenty-seven months. He sentenced Abad to twenty-one months.
 
 
 13
 The departures thus reduced the sentence of Lara from nearly twenty years to ten years, of Burgos from nearly sixteen years to ten years, and of Abad from fifty-one months to twenty-one months.
 
 Discussion
 I. Lara's appeal
 
 14
 Lara contends that the supplemental jury instructions were defective for lack of an adequate statement of the requisite mental state for a conspiracy conviction and because of the illustrative references to the facts of his case. Neither point has merit. The charge adequately conveyed the thought that a conspiracy conviction requires proof of active participation with knowledge of the venture's illegal purpose. See United States v. Jones, 30 F.3d 276, 282 (2d Cir.), cert. denied, --- U.S. ----, 115 S.Ct. 602, 130 L.Ed.2d 513 (1994); United States v. Locascio, 6 F.3d 924, 944 (2d Cir.1993), cert. denied, --- U.S. ----, 114 S.Ct. 1646, 128 L.Ed.2d 365 (1994).
 
 
 15
 Though we have cautioned against the use in jury charges of hypotheticals that closely resemble the facts of a case, see United States v. Gaggi, 811 F.2d 47, 61-62 (2d Cir.), cert. denied, 482 U.S. 929, 107 S.Ct. 3214, 96 L.Ed.2d 701 (1987); United States v. Gleason, 616 F.2d 2, 14 (2d Cir.1979), cert. denied, 444 U.S. 1082, 100 S.Ct. 1037, 62 L.Ed.2d 767 (1980); United States v. Dizdar, 581 F.2d 1031, 1037 (2d Cir.1978), the instruction in this case provides no basis for disturbing the conviction. The principal risk of such hypotheticals is that they will make an unbalanced presentation that illustrates circumstances sufficient for conviction but not circumstances warranting an acquittal. If so, the jury may be unduly influenced toward a guilty verdict. That risk was of no concern in Lara's trial, once he admitted in his detailed testimony to all the key aspects of the Government's allegations.
 
 II. The Government's cross-appeal
 
 16
 More substantial is the Government's contention that Judge Martin erred in concluding that the "quantity/time factor" had not been adequately considered by the Sentencing Commission and was therefore an available ground for a departure. The Government contends that consideration of the "quantity/time factor" disregards the Commission's expressed preference for correlating drug sentences with aggregate quantities for which a defendant is accountable and the Commission's implementation of that preference through the drug-quantity table. In addition, the Government criticizes Judge Martin's methodology in selecting short and variable time periods for implementing the "quantity/time factor."
 
 
 17
 At the outset, we are unpersuaded by the Government's citation of cases in which we have affirmed narcotics sentences based on aggregate quantities. See, e.g., United States v. Rosa, 11 F.3d 315, 343-44 (2d Cir.1993), cert. denied, --- U.S. ----, 114 S.Ct. 1565, 128 L.Ed.2d 211 (1994); United States v. Beverly, 5 F.3d 633, 641-42 (2d Cir.1993). Decisions in which a departure was not even argued, much less rejected on appeal, are hardly authority for ruling that a departure is unavailable.
 
 
 18
 Examining the issue of whether the "quantity/time factor" has been adequately considered by the Commission, we note, as is often the case, the absence of explicit language putting the issue to rest. Thus, the Commission has not said, "We have considered whether to vary sentences depending on the quantity sold at any one time and decided not to permit any such variation from the aggregation principle," nor has it said, "We have begun to think about whether to vary sentences depending on the quantity sold at any one time and have not yet reached a decision on that issue." Of course, as the Commission has acknowledged, even explicit reference to a factor does not necessarily indicate that it has received the adequate consideration that precludes its use for a departure. With exceptions not here applicable, "the Commission does not intend to limit the kinds of factors, whether or not mentioned anywhere else in the guidelines, that could constitute grounds for departure in an unusual case." Guidelines Manual, Ch. 1, Pt. A, Sec. (4)(b), at 6 (emphasis added). And even adequate consideration of a factor in general would not preclude its use as a ground for a departure if the factor was present in a particular case "to a degree" not adequately considered. 18 U.S.C. Sec. 3553(b) (1988).
 
 
 19
 There is surely some basis for thinking that the Commission has considered the "quantity/time factor" and decided not to permit variations based on it. One indication is the combination of the drug-quantity table and the relevant-conduct guideline. The latter makes a defendant punishable for the total quantity he either personally handled or could reasonably have foreseen that others involved in joint activity with him would handle. U.S.S.G. Sec. 1B1.3(a)(1)(A), (B). The drug-quantity table appears to contemplate a base offense level calibrated strictly according to the aggregate quantity for which the defendant is responsible, without any variation for the "quantity/time factor."
 
 
 20
 A further, somewhat indirect, indication of consideration is the availability of the adjustment for role in the offense--upward for managerial roles and downward for minor or even minimal roles. Id. Secs. 3B1.1, 3B1.2. Since Judge Martin made his departures in part to reflect the fact that the three defendants should be punished less severely than drug "king-pins," it is arguable that, in effect, he made a departure for role in the offense, a factor the Commission has already considered.
 
 
 21
 On the other hand, there is also some basis for believing that the Commission has not adequately considered the "quantity/time factor," at least as it applies to those whose base offense levels place them at the high end of the sentencing table. One indication is Judge Martin's point that Congress expected the high sentences it had authorized to be imposed on "a stereotypical drug dealer" whose drug profits buy big cars and expensive jewelry. If Congress was not thinking about someone like Pedro Lara in authorizing the Commission to impose high sentences, then perhaps the Commission itself was not thinking about someone like him when it constructed the drug-quantity table and applicable sentencing guideline.
 
 
 22
 There is, however, a far more explicit indication that, at least prior to the sentencing of these appellants, the Commission had not adequately considered the "quantity/time factor" as applied to a defendant at the high end of the sentencing table. This is the Commission's amendment No. 485, effective November 1, 1993, which added application note 16 ("Note 16") to section 2D1.1. That amendment recognizes that under some circumstances, in the Commission's words, "the quantity of the controlled substance for which the defendant is held accountable under Sec. 1B1.3 (Relevant Conduct) may overrepresent the defendant's culpability in the criminal activity." U.S.S.G. App. C, amend. 485. The Commission says that to "address this issue," id., it authorizes the limited departure described in Note 16. That departure is available for defendants whose base offense level resulting from aggregated drug quantities is greater than 36, unless disqualified by certain criteria such as one or more prior felony convictions for a violent or drug offense or possession of a firearm. U.S.S.G. Sec. 2D1.1, comment. (n. 16(a), (c)). The limitations of Note 16 can have no restrictive effect upon the appellants, since their offenses were committed prior to the November 1, 1993, effective date of Note 16. We need not consider whether, as to those who commit offenses thereafter, Note 16 precludes departures for those not within its terms, either because Note 16 is exclusive or because it represents the Commission's adequate consideration of the "quantity/time factor."
 
 
 23
 It is arguable that Note 16 is not the Commission's initial consideration of the issue the Commission has identified--that some high-end quantities may overrepresent culpability. The argument would be that the Commission previously had considered this issue and had elected to apply the drug-quantity table uniformly, without any high-end variation for ameliorating considerations like the "quantity/time factor," and that Note 16 represents, not a new consideration of the issue, but only a modest change of position from a prior consideration of the issue. However, the wording of Note 16 permits, and, we think, suggests, a contrary view. This is that the Commission for the first time has "address[ed] the issue" of high-end quantities that sometimes overrepresent culpability and has decided to adopt a response to that issue. Especially if, as appears, the Commission is now "address[ing] the issue" for the first time, then Judge Martin was clearly entitled to make a departure for defendants to whom the restrictions of Note 16 do not apply, when he concluded that the previously unaddressed issue was presented in a case before him.
 
 
 24
 Moreover, our Court has twice recognized that high-end sentences may overrepresent culpability and justify a departure. One example is United States v. Restrepo, 936 F.2d 661 (2d Cir.1991), where we permitted a downward departure of four additional levels beyond the minimal role adjustment, in recognition of the fact that at the high end of the money-quantity table the sentence overrepresented the culpability of the defendant, even after according him the four-level adjustment for minimal role. Another example is the dictum, first stated in United States v. Imariagbe, 999 F.2d 706, 708 (2d Cir.1993), that in an unusual situation where the gap between the quantity of drugs actually possessed by a defendant and the lesser quantity reasonably believed to have been possessed is so great as to make application of the Guidelines grossly unfair, a downward departure might be warranted. We have twice repeated that dictum. See United States v. Ivonye, 30 F.3d 275, 276 (2d Cir.1994); United States v. de Velasquez, 28 F.3d 2, 6 (2d Cir.), cert. denied, --- U.S. ----, 115 S.Ct. 679, 130 L.Ed.2d 611 (1994).
 
 
 25
 On balance, we are persuaded that, at least as to defendants whose attributable aggregate quantities place them at the high end of the drug-quantity table, where sentencing ranges exceed the significant mandatory minimum sentences established by Congress, Judge Martin properly concluded that the normal guideline sentence may, in some circumstances, overrepresent the culpability of a defendant and that the "quantity/time factor," which was not adequately considered by the Commission, was available as a basis for departure. We need not decide whether the "quantity/time factor" can be a basis for departure as to defendants whose base offense level is not at the high end of the drug-quantity table.
 
 
 26
 The use of the "quantity/time factor" was appropriate for Lara and Burgos. The quantities attributable to them subjected them to guideline sentences of more than nineteen and fifteen years, respectively, they worked for modest wages, and they were not shown to have any proprietary interest in the drug operation of their employers. Judge Martin reasonably concluded that guideline sentences of more than fifteen years, based on aggregate drug quantities reflecting sales of approximately 50 grams per day, overstated the culpability of these two defendants. And his selection of a one-week interval for application of the "quantity/time factor" did not render the extent of his departure "unreasonable," see 18 U.S.C. Sec. 3742(e)(3) (1988), where it resulted in a ten-year sentence, not subject to parole. Though the quantities sold during the 24 hours a day that Lara's location was open were foreseeable by him and therefore properly considered in determining Lara's offense level, before a departure, see United States v. Cardenas, 917 F.2d 683, 687 (2d Cir.1990), Judge Martin's use of the quantities sold during Lara's 12-hour shift was not an unreasonable basis for applying the "quantity/time factor" in determining the extent of the departure.
 
 
 27
 We do not reach the same conclusion, however, with respect to Abad. It simply cannot be said that a guideline sentencing range of 51 to 63 months, indicated by his aggregate quantity of four ounces of heroin bought and resold during a four-month period, overstated his culpability. Application of the "quantity/time factor" to a person in Abad's circumstances would precisely realize the Government's apprehension that the entire structure of the Commission's drug-quantity table was being abandoned. Though the Commission's heavy reliance on aggregate quantities as the prime determinant of drug sentencing has received much criticism, see, e.g., Thomas W. Hutchinson, The Commission's Consideration of Culpability Departures in Drug Trafficking Cases, 6 Fed.Sent.Rep. 99, 99, 101 n. 1 (1993); Jon O. Newman, Five Guideline Improvements, 5 Fed.Sent.Rep. 190 (1993), the departure authority is not a license to courts to restructure the Guidelines for all defendants. That authority remains available, subject to limiting statutory standards, for individual defendants as to whom the guideline sentence is properly found to be inappropriate.
 
 Conclusion
 
 28
 On Lara's appeal, we affirm the conviction. On the Government's cross-appeal, we affirm the sentences of Lara and Burgos, and remand the sentence of Abad for resentencing.
 
 
 
 [1]
 So, for example, if you had a situation where people were distributing crack and one individual was selling the crack on the street and another individual was serving as a lookout taking the money from the pitcher, delivering it to the manager, those three people would be engaged in a conspiracy as they would be working together for the purpose of violating the law
 The issue then becomes, was the defendant a member of that type of conspiracy?
 It is not necessary that the defendant know all of the other members of the conspiracy. Here the indictment refers to a conspiracy headed by Maximo Genao. If you find that the defendant knew that he was engaged in a conspiracy with Maximo Genao, it is not necessary that he was engaged in a conspiracy with other people.... As long as he knew ... he was engaged with other people in carrying out the sale of crack cocaine as part of an organization with Maximo Genao in which he served the function of a lookout and collected money from the pitchers and delivered it to the person he believed to be the manager as part of the Genao organization, that would constitute the crime charged in the indictment.
 
 
 [2]
 In reaching this conclusion Judge Martin properly declined to consider two amendments that had been proposed to the Commission in 1992, 57 Fed.Reg. 62,832 (proposed Dec. 31, 1992), but which the Commission had not adopted in the subsequent round of amendments. See 58 Fed.Reg. 27,148 (May 6, 1993). These amendments would, in some circumstances, have limited the quantity on which a base offense level would be calculated to the quantity sold at any one time or within any 30-day period. Congress has specified that in determining whether the Commission has adequately considered a factor, courts are to look only to the Guidelines, policy statements, and official commentary of the Commission. 18 U.S.C. Sec. 3553(b) (1988); see United States v. Luscier, 983 F.2d 1507, 1510 (9th Cir.1993); United States v. Shetterly, 971 F.2d 67, 76 (7th Cir.1992). Amendments proposed to the Commission are singularly inappropriate as an indication of Commission consideration, since the Commission has generally been following the admirable practice of making available for public comment any amendment proposed to it for which a single Commissioner requests publication. 57 Fed.Reg. 62,832. "Therefore, publication of an amendment for comment does not necessarily indicate that the Commission or any individual Commissioner has formed a view on the merits of the proposed amendment." Id
 
 
 [3]
 The only adjustment in these calculations was a two-level reduction for acceptance of responsibility for each defendant