**UNITED STATES of America,**

v.

**Tyrone LACY, et. al.   Defendants.**

**Crim. No. 98–10185–NG.**

United States District Court,
D. Massachusetts.

May 19, 2000.

---

Lois M. Lewis, Law Office of Lois M. Lewis, West Newton, MA, Roger A. Cox, Ashland MA, for Tyrone Lacy.

John Salsberg, Salsberg & Schneider, Boston, MA, for Thomas Hargrove.

Matthew H. Feinberg, Segal & Feinberg, Boston, MA, for Shawn Mells.

John C. LaChance, Framingham, MA, for Calvin Dedrick, Jr.

Earl Howard, Law Office of Earl Howard, PC, Cambridge, Peter Parker, Peter Parker, Boston, MA, David A. Ruhnke, Ruhnke & Barrett, Montclair, NJ, for Art Lee Taylor.

Harold H. Hakala, Boston, MA, for Anthony Gary Cooper.

Stephen Hrones, Hrones & Garrity, Boston, MA, for Michael Curry.

Michael C. Bourbeau, Boston, Ma, for Theron Davis.

Albert F. Cullen, Jr., Law Offices of Albert F. Cullen Jr., Boston, MA, for Charles Evans.

Joan C. Stanley, Boston, MA, for James Gunn.

James P. Duggan, Boston, MA, for Damien Lighten.

George F. Gormley, Gormley & Colucci, P.C., Boston, MA, for Patrick McGowan.

James J. Cipoletta, Cipoletta & Ogus, Revere, MA, for Christopher Merritt.

Thomas J. Ford, Boston, MA, for Darrell Merritt.

Paul J. Haley, Law Office of Paul J. Haley, Hillsborough, NH, for Raul Montilla.

Tracy A. Miner, Mintz, Levin, Cohn, Ferris, Glovsky & Popeo, P.C., Boston, MA, for Howard Damien Oliver.

Geraldine Hines, Burnham, Hines & Dilday, John H. Cunha, Jr., Cunha & Holcomb, PC, Boston, MA, for Calvin Parker.

Melvin Norris, Newton, MA, for Kamal Parker.

Michael C. Andrews, Boston, MA, for Angelo Perkins.

Benjamin D. Entine, Boston, MA, for Marvin Perkins.

Walter B. Prince, Boston, MA, for Damien Perry.

Roger Witkin, Boston, MA, for Shon Perry.

Peter B. Krupp, Lurie & Krupp, LLP, Boston, MA, for Derrick Rogers.

William H. Keefe, Jamaica Plain, MA, for Douglas Rodriguez.

Dennis J. Kelly, Burns & Levinson, Boston, Ma, for Dwayne Turnbow.

Charles P. McGinty, Federal Defender Office, Boston, MA, for Alexis Valdez.

Henry F. Owens, III, Lane, Altman & Owens, Boston, MA, for Michael Veney.

James S. Dilday, Grayer, Brown & Dilday, Pamela E. Berman, Choate, Hall & Stewart, Christopher M. Waterman, Choate, Hall & Stewart, Boston, MA, for Tyre Veney.

John F. Palmer, Law Office of John F. Palmer, P.C., Boston, MA, for Charles Wilkerson.

Joseph S. Oteri, Oteri, Weinberg & Lawson, Kevin S. Nixon, Boston, MA, for Michael Wilkerson.

Philip A. Tracy, Jr., Boston, MA, Thomas J. Saunders, Baltimore, MD, for Reginald D. Neal.

Roger Witkin, Boston, William C. Brennan, Jr., Upper Marlboro, MD, for Basil Williams.

Michael J. Liston, Carr & Liston, Boston, MA, for Alphonzo Fowlkes.

John W. Laymon, Kaplan, Laymon & Gunning, Robert L. Sheketoff, Sheketoff & Homan, Robert L. Sheketoff, Sheketoff & Homan, Boston, MA, for Charles Miles.

Charles W. Rankin, Rankin & Sultan, Boston, MA, for Criminal Justice Act.

Patrick Hamilton, Office of the United States Attorneys, Theodore B. Heinrich, U.S. Attorney's, Boston, MA. for U.S. Attorneys.

### SENTENCING MEMORANDUM RE: MALCOLM DEDRICK, MICHAEL CURRY, AND DAMIEN PERRY

GERTNER, District Judge.

## TABLE OF CONTENTS

I. *BACKGROUND* .................................................*113*

II. *DAMIEN PERRY: IS A BULLET LODGED IN THE DEFENDANT'S HEAD AN EXTRAORDINARY PHYSICAL CHARACTERISTIC WARRANTING A DEPARTURE?—AND OTHER ISSUES* .....................*114*
   A. *Background* ........................................*114*
   B. *The Guideline Calculations* ........................*115*
   C. *Quantity of Drugs* ................................*116*
   D. *Bullet in His Brain* ..............................*117*

III. *MALCOLM DEDRICK—DEPARTURE FROM CAREER OFFENDER GUIDELINES* .....................................*119*
   A. *Background* ........................................*119*
   B. *The Guidelines Calculation* ......................*120*
   C. *Adequacy of Criminal History Category* ...........*121*
   D. *Credit for Discharged Term of Imprisonment* ......*123*

IV. *MICHAEL CURRY* ...........................................*124*
   A. Background ........................................*124*
   B. Guideline Calculation ............................*124*

This case involves over thirty defendants, most of whom are alleged to be members of the Castlegate "gang."[1] They

---

1. On June 10, 1998, a seventy-one count indictment was returned against thirty-one defendants. The defendants are Tyrone Lacy, Thomas Hargrove, Shawn Mells, Calvin Dedrick Jr., Art Lee Taylor, Anthony Gary Cooper, Michael Curry, Theron Davis, Malcolm Dedrick, Charles Evans, James Gunn, Damien Lighten, Patrick McGowan, Christopher Merritt, Darrell Merritt, Raul Montilla, Howard Damien Oliver, Calvin Parker, Kamal Parker, Angelo Perkins, Marvin Perkins, Damien Perry, Shon Perry, Derrick Rodgers, Douglas Rodriguez, Dwayne Turnbow, Alexis Valdez, Michael Veney, Tyrone Veney, Charles Wilkerson, and Michael Wilkerson. On May 12, 1999, a seventy-three count superceding in-

dictment was returned as against all of the defendants in the original indictment with the exception of Tyrone Lacy, Anthony Gary Cooper and Angelo Perkins. Mr. Perkins pled guilty to the indictment in *United States v. Bonilla,* No. 98–cr–10147 (D. Mass. plea entered Dec. 10, 1998). The government has agreed to dismiss the original indictment against him. The following defendants were not named in the original indictment but have been charged in the superceding indictment, Reginald Neal, Basil Williams, Alphonso Fowlkes and Charles Miles.

As is my practice, I delayed sentencing of those who had pled guilty to give the Proba-

are charged with drug distribution (crack cocaine) and, in the case of some, acts of violence. Sentencing has posed a considerable challenge, namely, how to enforce the dual concerns of the Federal Sentencing Guidelines, to eliminate unwarranted disparity among those convicted of the same crime, and at the same time, effect individualized justice.[2]

The prosecution resulted from the cooperation of a number of federal and state agencies including the Drug Enforcement Administration ("DEA"), the Boston Police Department ("BPD"), and the Boston Housing Police. Press reports have uniformly touted these efforts, and credited them with a dramatic reduction in youth violence in the area.

But however significant the overall prosecution effort has been, and however valuable, I have a unique obligation. I am obliged to sentence individuals, not groups. Not all of the indicted individuals stand in the same position with respect to the gang's activities.

The individuals who have pled guilty thus far are those who were charged with the sale of crack cocaine (cocaine base).[3] With few exceptions the charges did not involve violence. Nor did most defendants have significant records of violence. But even though they may be similarly situated, they have faced a wide range of lengthy sentences, a range that in my judgment did not reflect differences in their culpability.[4] Individuals who were identified as suppliers to several of the defendants faced lower sentences than individuals who were "only" street dealers. Some street dealers faced higher sentences than their perhaps more culpable peers if their criminal records triggered "career offender" status.[5] (*Compare* below, the sentence for Malcolm Dedrick, who was a "career offender" and Michael Curry, who was not.)

It did not take much to qualify for such status. In some cases, the difference between a roughly five year and a roughly ten year sentence was determined by a

---

tion Department an opportunity to do a single rendition of the offense conduct, and fit the roles of each of the defendants into the overall scheme. (I had followed this procedure in *United States v. Duarte*, No. 97–cr–10234 (D. Mass. indictment returned Sept. 4, 1997)). In these cases, however, the approach was inadequate. The major differences in sentencing were not attributable to role differences. The defendants are—with few exceptions—street dealers. Rather, differences in sentencing derived from differences in criminal history, quantity, and other factors.

2. 28 U.S.C. § 991(b)(1)(B) announces that one of the purposes of the Sentencing Commission is to "provide certainty and fairness in meeting the purposes of sentencing, avoiding *unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar criminal conduct,* while maintaining sufficient *flexibility to permit individualized sentences* when warranted by mitigating or aggravating factors not taken into account in the establishment of general sentencing practices." (Italics supplied.)

3. The defendants may be divided into three groups: The first group consists of those defendants who are charged with the more serious offenses in the superceding indictment,

namely Racketeering in violation of 18 U.S.C. § 1962(c) and 1962(d), and Murder in Aid of Racketeering in violation of 18 U.S.C. § 1959(a)(5) in addition to conspiracy to possess cocaine base with intent to distribute and distribution. These cases will go on trial in two months. A second group consists of those individuals who are cooperating with the government and are expected to testify in the fall trial or during the various sentencing proceedings. The third group are those charged with drug sale, for the most part.

4. Nor do I believe that the issue is solely one of disparity; the sentences for all the defendants that I have sentenced thus far are, with few exceptions, disproportionate to their own wrongdoings. This, however, is the regime that Congress enacted.

5. A defendant is a career offender "if (1) the defendant was at least eighteen years old at the time the defendant committed the instant offense of conviction (2) the instant offense of conviction is a felony that is either a crime of violence or a controlled substance offense and (3) the defendant has at least two prior felony convictions of either a crime of violence or a controlled substance offense." U.S.S.G. § 4B1.1.

single prior conviction for drugs. In other cases it was the quantity of drugs with which the individual was associated. Since every gram of crack cocaine yields large differences in the Base Offense Level, fact-finding differences create major disparities even as to individuals at the same level, i.e. street dealers.[6]

And while the Guidelines' emphasis on quantity and criminal history drives these high sentences, sadly, other factors, which I believe bear directly on culpability, hardly count at all: Profound drug addiction, sometimes dating from extremely young ages,[7] the fact that the offender was subject to serious child abuse, or abandoned by one parent or the other, little or no education.[8] Nor may I consider the fact that the disarray so clear in the lives of many of these defendants appears to be repeating itself in the next generation: Many have had children at a young age, and repeat the volatile relationships with their girlfriends that their parents may have had. And I surely cannot evaluate the extent to which lengthy incarceration will exacerbate the problem, separating the defendant from whatever family relationships he may have, or the impact on communities when these young men return.[9]

Finally, I may not compare these sentences to those meted out to individuals convicted of what would appear to be far more serious offenses. If I had credited the government's account that over fifty grams of cocaine base had been distributed in most of these cases, then I would have been obliged to assign an offense level of 32. This level yields a higher sentence for these defendants than it yields for those accused of, for example, transmitting top secret National Defense Information, level 29 (U.S.S.G. § 2M3.3); solicitation to commit murder, level 28 (U.S.S.G. § 2A1.5); assault with intent to commit murder, level 28 (U.S.S.G. § 2A2.1); criminal sexual abuse, level 27 (U.S.S.G. § 2A3.1); kidnapping, abduction and unlawful restraint, level 24 (U.S.S.G. § 2A4.1).

This memorandum specifically concerns three defendants, Damien Perry, Malcolm Dedrick, and Michael Curry, out of the ten[10] I have already sentenced. I write for the following reasons: To the extent that these cases reflect legal and factual issues which I have resolved in earlier cases and which, in my judgment, after seeing a number of defendants, are likely to recur, the better practice is to prepare a

6. On May 1, 1995, by a 4–3 vote, the United States Sentencing Commission sent to Congress proposed changes in the Sentencing Guidelines · for cocaine offenses. The changes would have made the starting point for determining sentences for powder and crack offenders the same by adopting a 1 to 1 quantity ratio. Pursuant to 28 U.S.C. § 994(p), Congress passed and the President signed legislation rejecting the Commission's proposed changes. See Pub.L. No. 104–38, 109 Stat. 334 (Oct. 30, 1995). In that legislation, Congress directed the Commission to submit new recommendations. In response, the Commission reiterated its core findings, that, although research and public policy may support somewhat higher penalties for crack than for powder cocaine, a 100 to 1 quantity ratio cannot be justified. United States Sentencing Commission, Special Report to Congress: Cocaine and Federal Sentencing Policy, reprinted in 10 Fed.Sent.R. 184 (January/February, 1998). These recommendations were never adopted.

7. "Drug or alcohol dependence or abuse is not a reason for imposing a sentence below the guidelines." U.S.S.G. § 5H1.4.

8. "Lack of guidance as a youth and similar circumstances indicating a disadvantaged upbringing are not relevant grounds for imposing a sentence outside the applicable guideline range." U.S.S.G. § 5H1.12.

9. Karen Eschbacher, *Jail Time's Up for Record Number, Boston Globe*, March 12, 2000, at B4.

10. The other defendants who have been sentenced are: Calvin Dedrick Jr. sentenced March 3, 2000; Anthony Gary Cooper sentenced March 1, 2000; Damien Lighten sentenced March 1, 2000; Raul Montilla sentenced March 1, 2000; Kamal Parker sentenced March 16, 2000; Derrick Rogers sentenced March 13, 2000; and, Dwayne Turnbow sentenced March 14, 2000.

written opinion. To the extent that these cases present unique, and particularly complex issues, which are not likely to recur, a written opinion provides a better vehicle for articulating my reasons. In answer to the question, "What role should individual sentencing judges play in the guideline development process?" Ronald Welch, Minority Counsel, Senate Subcommittee on the Constitution, Former Special Counsel, U.S. Sentencing Commission, wrote: "Sentencing judges must play a central role in the guideline development process and their mechanism for doing so is the issuance of sentencing opinions." 1 Fed.Sent.R. 372 (February/March 1989).

A word on procedure: The judgments have not issued in the case of defendants Dedrick, Curry and Perry. Accordingly, the appeal period has not begun to run. *See e.g. United States v. Derman*, 211 F.3d 175, 182 (1st Cir.2000) (forfeiture order becomes final for purposes of appeal when the court issues its judgment). I typically coordinate the release of my decisions to coincide with the issuance of the judgment, so that the parties are not prejudiced insofar as their appellate rights are concerned. In making the decision to appeal, they have the benefit of my decision and can take the full time allotted to its review.[11]

Nevertheless, if any party wishes to contest the findings of this decision, they have ten days from the date of its issuance to do so.[12] The judgment will not be issued until the ten day period has run.

## I. *BACKGROUND*

The indictments[13] target the so-called Castlegate and/or Castlegate Road Gang, alleged to be a "criminal organization whose members and associates engaged in distribution of controlled substances and in acts of violence including murder, assaults, threats, intimidation, and which operated principally in and around the area of Castlegate Road, Washington Street, Columbia Road, and Blue Hill Avenue in the Grove Hall section of Roxbury." The charges cover the period from 1991 through 1998. The indictment alleges that over the years, the Castlegate Gang has been involved with violent disputes with members of other gangs, the most bitter and violent of which was with the Humboldt Avenue Raiders.

But the indictment is misleading. There is a substantial question of how "gang-like" this "Castlegate" group was. As the Probation Department ("Probation") reports:

Castlegate is far less structured than most gangs or criminal enterprises. There is no formal hierarchy or chain of command to the gang, and the leadership was chosen very informally. The leadership often depended on the person's age, criminal history, access to drugs, whether or not they were incar-

---

**11.** Rule 4, Fed. Rules of App. Procedure, Rule 4(b)

  b) Appeal in a Criminal Case
    (1) Time for Filing a Notice of Appeal
    (A) In a criminal case, a defendant's notice of appeal must be filed in the district court within 10 days after the later of:
    i) the entry of either the judgment or the order being appealed; or
    ii) the filing of the government's notice of appeal.
    (B) When the government is entitled to appeal, its notice of appeal must be filed in the district court within 30 days after the later of:
    i) the entry of the judgment or order being appealed; or
    ii) the filing of a notice of appeal by any defendant.

    (2) Filing Before Judgment. A notice of appeal filed after the court announces a decision, sentence or order—but before the entry of the judgment or order—is treated as filed on the date of and after the entry.

**12.** The date on which the judgment is issued qualifies as the date of imposition of the sentence under Rule 35(c), Fed.R.Crim.P., after which the sentence may only be corrected as a result of "arithmetic, technical, or other clear error."

**13.** I use the plural, "indictments" because some pleas have been entered with respect to the initial indictment, and some, with respect to the superceding indictment.

cerated at the time, and they could not be addicted to drugs. Additionally, members and associates of Castlegate do not wear specific colors or symbols that signify membership or allegiance and there is no formal initiation process . . .

In short, the people involved "hung out" together, and when they did, "sold drugs." And while they "occupied a turf that they collectively protected from other people," there were no rules, no assigned roles or responsibilities. Indeed, they "often competed with each other for sales, and each maintained [his] own supply."

Perry, Dedrick and Curry, by all accounts, were street dealers of crack cocaine who lived in the area, and sold drugs from doorways and alleyways. While they may have benefitted from others protecting the Castlegate turf, there is no allegation that they were involved in the "gang's" violent activities.

## II. *DAMIEN PERRY: IS A BULLET LODGED IN THE DEFENDANT'S HEAD AN EXTRAORDINARY PHYSICAL CHARACTERISTIC WARRANTING A DEPARTURE?— AND OTHER ISSUES*

### A. *Background*

Damien Perry pled guilty to a superceding indictment charging him with six counts of possession of crack cocaine with intent to distribute and distribution. Each of the six counts reflect a "buy" on the part of undercover police officers. Each is uncontested (January 6, 1997, July 2, 1997, July 30, 1997 [two transactions], August 16, 1997, December 10, 1997). The total quantity involved is 3.73 grams.

Perry is a twenty-one year old man with a minimal criminal history. His two criminal convictions occurred when he was fifteen and sixteen. At fifteen, he was convicted of trespassing and disorderly conduct. On October 18, 1994, at the age of sixteen, a friend of his was playing with a shotgun and it accidentally discharged. Perry was shot on the left side of his head and lost an eye. Because of the dangers of surgery, and the bullet's proximity to a major artery, the bullet remains in his head to this day.

The record suggests that from the day of the shooting forward, Perry's behavior changed. Within a year he was convicted of armed robbery and, shortly thereafter, dropped out of school. His life, not easy before, was made even more complicated by his disability. His mother and father were both sixteen when Perry was born. His mother abandoned him at a relatively young age, abusing drugs and working as a prostitute. His father, Jesse Jeter, absented himself from his son's life until his son was ten.

Nevertheless, Perry is not a man without prospects. He was raised by his maternal grandmother, with whom he has a good relationship. Likewise, between the ages of ten and thirteen he resumed a relationship with his father, after Mr. Jeter graduated college, residing with him on and off. He reported to Probation that his father was strict, that he did not like the rules and routinely returned to his grandmother.

In addition, Mr. Perry is a new parent, and claims to have a consistent relationship with the child's mother.[14] In court during the sentencing hearing was Mr. Perry's grandmother, father, and his girlfriend.

I held five days of hearings. The parties were given the opportunity to present voluminous medical records, evidence, and argument. In addition, I directed that the defendant be examined by Dr. Laurence Weisman, a psychologist selected by Probation prior to the final sentencing, to determine precisely what impact the bullet

---

**14.** There is a dispute as to whether Mr. Perry is also the father of another child, with a    different woman.

might have on Mr. Perry's current mental state.

While there are numerous issues, the central one is whether the bullet in Mr. Perry's brain, which could become dislodged at any time, and which causes him to have grand mal seizures, etc. represents the kind of extraordinary physical circumstance for which a departure may be justified. Significantly, the government claims it does not.

### B. *The Guideline Calculations*

I found the following:

*Base Offense:*

The government took the position that the quantity of drugs attributable to the defendant pursuant to U.S.S.G. § 1B1.3 was at least 50 (fifty) grams but less than 150 (one hundred and fifty) grams of cocaine base and therefore, that his Base Offense Level was 32 (U.S.S.G. § 2D1.1(c)(4)). The defendant claimed that the quantity of drugs attributable to him was at least three grams but less than four grams, for a Base Offense Level of 22 (U.S.S.G. § 2D1.1(c)(9)).

I concluded, by a fair preponderance of the evidence as described below, that the relevant quantity was between four and five grams, for a Base Offense Level of 24 under U.S.S.G. § 2D1.1(c)(8).

*School Zone Adjustment:*

The defendant agreed in the plea agreement that at least one of the transactions at issue here took place in a school zone, warranting an increase of two levels under § 2D1.2(a)(1) [15] for a Base Offense Level of 26.

*Role:*

The defendant argued that he was a minor or a minimal participant, reducing his Base Offense Level by two or four respectively, pursuant to U.S.S.G. § 3B1.2(b). The government opposed, and urged no adjustment. I agreed with the government, concluding that no adjustment was required.

*Acceptance of Responsibility:*

All agreed that a reduction of two levels was appropriate for acceptance of responsibility under U.S.S.G. § 3E1.1(a), yielding an adjusted Base Offense Level of 24.

*Criminal History:*

Mr. Perry has a criminal history of II, leading to a Guideline range of 57–71 months

*Departure:*

Mr. Perry moved for a downward departure because of his extraordinary physical condition, under U.S.S.G. § 5H1.4. For the reasons described below, I granted that departure.

*Sentence:*

I concluded that the defendant is entitled to a downward departure of three levels to an Offense Level of 21, with a range of 41 to 51 months. I sentenced the defendant to 47 months with 11 months credit for time served in federal custody. I anticipated that in the remaining 36 months he would qualify for the 500 hour drug treatment program, which I strongly recommended. In addition, I tailored the sentence—both the prison sentence and the supervised release—to match the recommendations of Dr. Laurence Weisman, the psychologist who had evaluated Mr. Perry.[16]

---

15. At Derrick Rogers' sentencing, I agreed that enhancement under § 2D1.2(a)(1) was not appropriate when the defendant did not plead to the school zone offense, 21 U.S.C. 860, and did not stipulate to the school zone enhancement as relevant conduct. U.S.S.G. § 1B1.2(c). Here, however, Mr. Perry did so stipulate.

16. Those conditions consist of:

1) Neuropsychological testing to determine Mr. Perry's cognitive limitations and potentials.
2) Occupational therapy, depending on the test results.
3) Psychotherapy to address early abandonment issues, self-esteem and anger management.
4) Participation in any available prison programs of education (GED) and job training.

## C. *Quantity of Drugs*

The Guidelines place an extraordinary emphasis on the quantity of drugs with which the defendant was involved, rather than on the more traditional measures of culpability, like *mens rea*. While drug quantity is, in effect, a proxy for culpability, it is an imperfect measure. Quantity, for example, has the same significance for the "mule" as for the "kingpin"; if they touched the same drugs their Base Offense Level would be the same.[17] And it has particular resonance when the drug is crack cocaine as opposed to cocaine powder. As I noted above, with crack, relatively small quantity differences produce profound differences in outcome.

Given the significance of this factor, I had serious concerns about the nature of the government's proof. Here the quantity which the government seeks to prove depends not upon monitored "buys" conducted by undercover police agents, whose acts were frequently audio and videotaped. The difference in proof depends upon the testimony of cooperating witnesses. While the monitored "buys" amounted to 3.73 grams, the government suggests that much more was involved, namely between 50 and 150 grams.

Since the government did not provide Probation with any evidence to support that amount, Probation adopted the lower figure, 3.73 grams. And even if the government had provided the information, Probation took the position, with which I strongly concur, that the validity of testimony provided by codefendants should be determined by the Court. This is particularly the case where the factual issues

5) Active participation in Relapse Prevention (substance abuse) education, and in AA/NA.
6) Strict probationary supervision upon release.
7) Release to a supervised half-way house setting.
8) Random, frequent urinalysis testing.
9) Daily AA/NA meetings within the community.
10) If indicated psychopharmacological evaluation for depression, ADD.

concern a) the Base Offense Level, and thus can dramatically affect the sentence, b) are contested, and c) where the resolution of the contest involves issues of credibility.

The government offered three witnesses and one videotape. Two of the three witnesses are cooperating witnesses, one an undercover officer. Based on the testimony of Officer Brown, the undercover officer, the only testimony I credit, I agree with the government that more than four grams were involved, but I cannot find more than five grams by a preponderance of the evidence.

The two cooperating witnesses have powerful incentives to "please" the government; they are themselves facing substantial terms of imprisonment on account of the same offenses as Mr. Perry. And while it may be one thing to say that the witnesses are believable enough to substantiate that drug dealing occurred—of that there is no doubt—it is not at all clear that these witnesses are believable enough to testify about specific quantities. They obviously kept no records. Many were addicts, largely in a fog through much of their own transactions. They were hardly the most precise observers, let alone the most truthful witnesses.

While I appreciate the government's oft expressed dilemma, that they cannot rely on seminary students for their witnesses, where sentencing depends so heavily on this gram or that gram of crack cocaine, where so much depends upon whether drugs were sold once a week or twice a week, I must be particularly careful.[18]

17. "[U]nder the Guidelines, a dealer caught selling a kilogram of cocaine on a single occasion would receive the same sentences as a street vendor who admitted to an undercover agent that he had sold 25 grams of cocaine a day while working on the same street corner for about seven weeks." *United States v. Genao*, 831 F.Supp. 246, 248 (S.D.N.Y.1993).

18. "Courts must sedulously enforce that quantum-of-proof rule [preponderance of the evidence], for, under the guidelines, drug

Howard Damien Oliver, is a case in point. I have already found Mr. Oliver to be less than credible. In *United States v. Kamal Parker* (Mr. Parker is a defendant in this case), the presentence report recounted a number of undercover buys. In each, the officer's account suggested that Parker was a dealer "wannabe," not remotely a regular source of drugs: He would slip his pager number to an officer buying from someone else, and when the officer called he would not answer it or if he managed to answer the page, he could not come up with any drugs, much less the quantity requested. For some of the period that Oliver testified, Kamal Parker was either living with his mother, who testified as to her observations which, to a degree, contradicted Oliver's, or, in jail.

Yet Oliver confidently testified that Parker was his source of drugs, consistently, over time, every week, almost daily. The picture was so fundamentally at odds with everything else I had heard or read as to be completely unbelievable.

Likewise was Oliver unbelievable in this case. He was facing the mandatory minimum ten years' incarceration. He claimed that he observed Perry in a handful of transactions, but he agreed that the transactions could have involved marijuana. Furthermore, when interviewed at an earlier time, he reported that he had observed only one Perry transaction.

Nor do I credit the testimony of Shawn Mells with respect to specific quantities. Like Oliver, he is facing substantial penalties, 262 to 327 months on one theory, 292 to 365 on another. He acknowledged lying to law enforcement officers, and prison officials. He gave repeated accounts of Mr. Perry that were inconsistent (telling the agents that Perry sold for him, then

claiming that he was misquoted in the report, indicating one amount for daily sales of drugs in one account, a different amount in another).

I do credit the testimony of Officer Greg Brown, an undercover officer. While his testimony suggests that there were more controlled "buys" than the 3.73 grams involving undercover officers, he is vague as to how many more. He observed drug dealing on other occasions, but no evidence was recovered and no dates were offered. Nor was there any indication of the kind of drugs involved.[19]

Finally, the government played a videotape of the neighborhood in which much of the dealing took place. It was a chilling sight—drug dealing on the part of many of the defendants taking place in full view of children playing, under the windows of apartments. But in terms of this defendant, and the specific quantities involved, it did not add to the inquiry. It presented views of the two dates in July of 1997 on which the defendant had already acknowledged he sold crack. And the view presented on the third date, of September 4, 1997, was not incriminating at all. Perry was rolling dice with some of the other codefendants.

### D. *Bullet in His Brain*

■ "Extraordinary physical impairment" represents a permissible departure. U.S.S.G. § 5H1.4. It "may be a reason to impose a sentence below the applicable guideline range." While the Sentencing Commission has not indicated what illnesses or physical burdens qualify, courts have stepped in the breach. *See e.g. United States v. Basey*, 67 F.3d 303 (unpublished opinion), 1995 WL 567356 at *1 (8th Cir.

---

quantity has a dramatic leveraging effect. Thus, relatively small quantitative differences may produce markedly different periods of immurement. This reality informs the preponderance standard, requiring that district courts must base their findings on 'reliable information' and, where uncertainty reigns, must 'err on the side of caution.' " *United States v. Sepulveda*, 15 F.3d 1161 (1st Cir.

1993); *United States v. Sklar*, 920 F.2d 107, 112–113 (1st Cir.1990) (quoting *United States v. Walton*, 908 F.2d 1289, 1302 (6th Cir. 1990), *cert. denied*, 498 U.S. 990, 111 S.Ct. 532, 112 L.Ed.2d 542 (1990)).

**19.** Perry was known to have sold marijuana.

1995) (Kidney cancer); *United States v. Greenwood*, 928 F.2d 645, 646 (4th Cir. 1991) (double amputation); *United States v. Boy*, 19 F.3d 30 (unpublished opinion), 1994 WL 59781, at *3 (9th Cir.1994) (degenerative hip and knee conditions with non active tuberculosis and Hyperactive Adjustment Disorder). Courts of appeals decisions, moreover, are part of the picture. Only a small percentage of cases are appealed. Appellate courts see sentences from a different vantage point than do district courts—reviewing facts based on an abuse of discretion standard—and are, in the vast majority of cases, reviewing the denials of a departure. To evaluate where the case at bar stands relative to other defendants I must look to (a) my own experience, (b) the written decisions of other trial courts, and, (c) where time permits, the record of other judges, whether or not they have reduced their findings to an opinion. *See United States v. Thompson*, 74 F. Supp.2d 69 (D.Mass.1999) (in which I examined the presentence reports of over sixty defendants to determine what qualifies as an extraordinary family characteristic).

In this case, I considered (a) and (b). For example, qualifying physical conditions have been found by trial courts that have written opinions to include such things as amyotrophic lateral sclerosis (Lou Gehrig's Disease), *United States v. Roth*, 1995 WL 35676, at *1 (S.D.N.Y. Jan.30, 1995); a polio crippled leg, *United States v. McClean*, 822 F.Supp. 961, 962 (E.D.N.Y.1993); and chronic obstructive pulmonary disease, *U.S. v. Little*, 736 F.Supp. 71 (D.N.J.) aff'd, 919 F.2d 137 (3rd Cir.1990). I also reviewed a general table of departures which is provided for me by Probation, describing the downward departures granted by other judges on these grounds in summary fashion.

Damien Perry has a bullet in his brain. The question is whether that is an extraordinary physical characteristic sufficient to warrant a downward departure. To ask the question is almost to answer it.

The bullet was, and continues to be, lodged in his head next to an artery. The defendant lost partial hearing in his left ear, has blood clots in his arteries, and experiences seizures. The bullet passed through the left eye and lodged near the left internal auditory canal. On October 14, 1997, Perry had a general seizure and was diagnosed with epilepsy. Between 1994 and 1996 the defendant underwent surgery on a number of occasions and was hospitalized a number of times. While he is obliged to take blood thinning medication to prevent clots, that medication could also complicate clotting should he be cut. He cannot participate in athletic activities. Fighting or a sharp blow to the head, not an unlikely event in prison, could dislodge the bullet.

The shooting also had emotional consequences for Perry. Dr. Weisman reports that Perry's existing, chronic major depression was exacerbated by post-traumatic stress disorder, after the shooting.[20] He experienced anger at the injury, began to skip classes and shortly after, withdrew from school altogether.[21] This account is confirmed by the medical records: In 1996, after a grand mal seizure, he reported to the doctor that he did not drive, go to school or work, and the doctor noted ("[I]t seems that he has not done much of anything since sustaining the gunshot wound two years ago.") He reported that he had good grades before the shooting, but then everything deteriorated. He became forgetful. There were grand mal seizures and sensory flashbacks from the moment of trauma, triggered by any metallic sound—not an unlikely sound in a prison.

---

**20.** Indeed, Dr. Weisman's report suggests another ground for departure here, considered in conjunction with the instant one, U.S.S.G. § 5K2.13, diminished capacity.

**21.** Mr. Jeter, Perry's father, and Ms. Perry, his grandmother, differ on whether some changes began after the gunshot wound or began before.

The government claims that I should ignore all of this because the video shows Mr. Perry hanging out with violent offenders, not disabled from participating in their drug dealing activities, not holding back in any way. To be sure, the government is not suggesting that this video shows Perry is healthy, not at considerable risk. The condition is incontestable.

Rather, the government's position is something like assumption of the risk in tort; since Mr. Perry put himself in harm's way, why should we care? In this regard, the government cites *United States v. DeCologero*, 821 F.2d 39, 43 (1st Cir.1987) In which the Court affirmed denial of departure for a severe back injury and noted that "the state of defendant's health ... did not deter him from engaging in the felonious activities which brought him to his present predicament." That statement—in dicta, in a footnote—would disqualify almost any defendant from a departure on this ground, unless the disability began after the offense.

In fact, the First Circuit noted that while "poor health" should not "automatically" and "in and of itself ... shield a convicted felon from his just deserts," it can enter into the "delicate balancing of interests and concerns" that are "best considered ... by the sentencing court." [22] And just because Damien Perry, woefully immature, even at 21, and profoundly depressed, was irresponsible, does not mean that this Court should be as well.

The Sentencing Guidelines mandate the parsimony principle: I am obliged to assign a sentence "sufficient, but not greater than necessary" to comply with the purposes of sentencing.[23] Accordingly, I departed downward three levels, from level 24 to a level 21, and sentenced Mr. Perry to the mid point of the range in order to make certain that he qualify for the 500 hour intensive treatment program. In ad-

22. *Id.*

23. Those purposes include just punishment, deterrence, public protection, and to "provide the defendant with needed educational or vo-

dition, I made Dr. Weisman's recommendations a part of my recommendations to the Bureau of Prisons and to Probation on supervised release.

## III. MALCOLM DEDRICK—DEPARTURE FROM CAREER OFFENDER GUIDELINES

### A. Background

Malcolm Dedrick pled guilty to counts 17 and 18 of the original indictment charging him with distribution of crack cocaine on April 16 and April 17, 1997, pursuant to 21 U.S.C. § 841(a)(1). A street dealer, like Perry, Dedrick had fewer controlled "buys" but a more substantial record. Significantly, he had no criminal record at all until he was twenty-one; no juvenile record, not even arrests. Although he had experimented with other drugs, he became addicted to crack cocaine the first time he tried it at age twenty-one. Over the next eight years (between the ages of twenty-six and thirty-four) he amassed enough convictions to qualify for career offender status under the Guidelines. Because of the career offender provisions, his Guideline range, absent departures, was 151 to 188 months. His record, however, is largely non-violent, and relatively minor, the kind that characterizes an out-of-control addict.

Dedrick's career offender status so distorts this sentencing that few other facts matter. A few examples of other facts: Dedrick has an ongoing relationship with his mother, but no relationship with his birth father. His mother later married Ernest Kelly, but they too separated, although Mr. Kelly remains involved in Dedrick's life. Mrs. Kelly, reportedly the first black woman court officer in Massachusetts, has not participated in the sentencing at all.

cational training, medical care, or other correctional treatment in the most effective manner." 18 U.S.C. § 3553(a)(2)(D).

Dedrick withdrew from high school after the ninth grade but could not maintain employment because of chronic eczema and asthma. He was receiving disability payments for a time, later discontinued when the agency found him to be no longer disabled.

He has a stable relationship with Michelle Carter, a young woman who recently gave birth to his son. He takes care of both his son and Ms. Carter's daughter from a previous relationship. Ms. Carter and Mr. Dedrick have known each other since 1988, but became romantically involved in 1995 and 1996.

Counsel for Mr. Dedrick was extraordinarily vigilant. In the plea agreement, she reserved the right to argue that he was not a career offender, but also, in response to the Court's pointed inquiries, addressed a number of other issues as well, both orally and with written submissions.

Sentencing took place over three days.

### B. The Guidelines Calculation

#### Quantity:

The two counts to which Dedrick pleaded guilty reflect controlled drug transactions on April 16, 1997 (for .39 grams of cocaine base), and on April 30, 1997 (for .17 grams of cocaine base). In addition, on May 23, 1997, defendant was arrested with .8 grams of crack which resulted in a conviction for possession with intent to distribute in the Dorchester District Court.[24] Pursuant to U.S.S.G. § 2D1.1(c)(11), since the amount of cocaine

base is at least 1 gram but less than 2 grams, the Base Offense Level is 18.

The government claimed that much more was involved, again the figure 50 to 150 grams, and represented that it would offer the testimony of cooperating witnesses to justify the higher amount. Since it did not, Probation used only the quantity described above, between 1 and 2 grams. I agreed with Probation.

#### Acceptance of Responsibility:

U.S.S.G. § 3E1.1(a) leads to a decrease of three points to a total offense level of 15.

#### Career Offender:

Because Mr. Dedrick meets the career offender provisions at U.S.S.G. § 4B1.1, the Offense Level increased to 32, yielding, with an acceptance of responsibility deduction (pursuant to U.S.S.G. § 3E1.1(a)), a total offense level of 29.[25]

#### Criminal History:

Dedrick's criminal history score was 14, yielding a category VI, the highest criminal history category.

In any event, the criminal history category set for individuals who qualify as career offenders under U.S.S.G. § 4B1.1 is VI, notwithstanding their actual score.

The Guideline range for Offense Level 29, criminal history VI, absent departures, is 151 to 188 months.

#### Downward Departure:

Defendant challenged the career offender characterization, first by asking the Court not to count certain convictions because they were part and parcel of the

---

24. This was originally characterized as part of the defendant's criminal history but, upon defense counsel's objection, probation shifted its characterization of this incident to make it part of the "relevant conduct" comprising the offense (par. 12(a)). On May 23, 1997, the Youth Violence Strike Force seized a quantity of crack from Mr. Dedrick, while Mr. Dedrick was in the area of 7 Morse Street. The arresting officers were from the unit involved in the instant federal charges. The arrest was only a month after the last controlled buy (April 30, 1997) from Mr. Dedrick. The loca-

tion was identical to the location that is the site of the instant offenses.

25. A defendant is a career offender under U.S.S.G. § 4B1.1 if 1) the defendant is over the age of eighteen, 2) the instant offense is a felony that is either a controlled substance violation or a crime of violence and 3) the defendant has two prior convictions of either a crime violence or an applicable controlled substance violation.

instant offense, and second, by moving to depart under U.S.S.G. § 4A1.3 claiming that his criminal history "significantly over-represents the seriousness of [his] criminal history or the likelihood that ... [he] will commit further crimes."

In addition, the defendant argued that he should receive 15 months' credit for time served in state custody on the state charge that the parties recognized was part of this offense. *See supra*, note 24.[26]

Based on 15 months' credit, the Guideline range is 136 to 173, or between a level IV and V, Offense level 29. In addition, I have departed one more level, to a level III under U.S.S.G. § 4A1.3, yielding a range of 108 to 135.

I sentenced Mr. Dedrick to 108 months on counts 17 and 18, to be served concurrently with each other, a recommendation to the Bureau of Prisons for incarceration at FCI Raybrook, participation in the 500 hour intensive drug treatment program, supervised release for three years with the explicit requirement that the defendant submit to drug testing and drug treatment while on supervised release.

## C. *Adequacy of Criminal History Category*

■ A number of courts have allowed departures below the ranges set by the career offender guideline based on the principles set forth in U.S.S.G. § 4A1.3.

Recognizing the inadequacies of the criminal history scoring system, the Commission encouraged departures where "reliable information" indicates that the criminal history category "significantly over-represents the seriousness of a defendant's criminal history or the likelihood that the defendant will commit further crimes."[27] *See, e.g. United States v. Lindia*, 82 F.3d 1154, 1164–65 (1st Cir.1996); *United States v. Rivers*, 50 F.3d 1126, 1130 (2nd Cir.1995); *United States v. Shoupe*, 35 F.3d 835, 837 (3rd Cir.1994); *United States v. Adkins*, 937 F.2d 947, 952 (4th Cir.1991); *United States v. Fletcher* 15 F.3d 553, 557 (6th Cir.1994); *United States v. Senior*, 935 F.2d 149 (8th Cir.1991); *United States v. Reyes*, 8 F.3d 1379, 1387 (9th Cir. 1993); *United States v. Collins*, 122 F.3d 1297, 1305–1308 (10th Cir.1997) (upholding departure based on defendant's age, infirmity and mitigating circumstances surrounding one of defendant's predicate convictions); *United States v. Webb*, 139 F.3d 1390, 1395 (11th Cir.1998); *United States v. Spencer*, 25 F.3d 1105, 1112 (D.C.Cir.1994). Because the career offender guideline increases both the defendant's offense level and criminal history category, a § 4A1.3 downward departure could reduce either or both of those scores. *See, e.g. Shoupe*, 35 F.3d at 837.[28]

---

**26.** Credit for this time is technically a departure because the defendant was convicted of the state offense and, by the time of the federal sentencing, had already served his state sentence. *See* part D, below.

**27.** Indeed, some commentators noted the "extensive use of departures from sentences generated by career offender provisions." Michael S. Gelacak and Ilene H. Nagel, Departures Under the Federal Sentencing Guidelines: An Empirical and Jurisprudential Analysis, 81 Minn. Law Rev. 299, 356 (December 1996). Moreover, because the career offender provisions require a sentence at or near the maximum term authorized, the resulting departures were quite often substantial. *Id.* at 357.

Clearly, § 4A1.3 departures are "encouraged departures" under *Koon v. U.S.*, 518

U.S. 81, 116 S.Ct. 2035, 135 L.Ed.2d 392 (1996).

**28.** Significantly, to qualify for this departure, unlike departures in Chapter 5, the court does not have to find that there is something atypical about the record. Specifically, the court does not have to find that "there exists an aggravating or mitigating circumstance of a kind, or to a degree, no adequately taken into consideration by the Sentencing Commission." 18 U.S.C. § 3553(A)(7)(b). The statutory authority for the promulgation of U.S.S.G. § 4A1.3 lies not in 18 U.S.C. § 3553(A)(7)(b), but "in the provision of the Sentencing Reform Act, that gives the Commission the authority ... to take into account, where relevant, the defendant's criminal background," *United States v. Shoupe*, 988 F.2d 440, 446 (3rd Cir.1993).

Dedrick's record is largely non-violent. The one exception to that characterization was his June 4, 1992, conviction for unarmed robbery (paragraph 32 of the Presentence report). This offense was, according to the police report, a purse snatching. While the initial allegation was "armed robbery," he pled to unarmed robbery. There is no way of knowing "reliably," short of relitigating the case, whether there was in fact a gun, and the offer was just "plea bargained" down, or simply, that the victim thought there was one.

The remaining offenses were tried in the Dorchester District Court. They are mostly convictions for possession or possession with intent to distribute crack.[29] At least four occurred during the time period of the offenses alleged here (between 1994 and 1998), one, just a month after the purchase described in count 18, on April 30, 1997, the second, a year later.

Judge Weinstein's description of the defendant's record in *United States v. Hammond*, 37 F.Supp.2d 204 (E.D.N.Y.1999) is apt here: "His prior arrests result from minor drug crimes involving facilitation of the sale of drugs and the kind of petty criminality associated with a poor addict's attempt to acquire money for the purchase of narcotics." *Id.* at 205. "Unlike more affluent people with a cocaine habit," the court notes, "Mr. Hammond's relatively menial employment could not support both his drug dependency and his family." *Id.* at 205. *See also, Rivers*, 50 F.3d at 1131; *United States v. Rogers*, 972 F.2d 489 494 (2nd Cir.1992).[30]

As is my practice, I considered not only my experience in evaluating whether a

---

In *Shoupe* the court held that because § 4A1.3 is specifically provided for in the Guidelines, it is "conceptually *distinct* from the provision in § 5K2.0 for departures based on factors not accounted for in the Guidelines." *Shoupe*, 988 F.2d at 442. *See e.g., United States v. Cadavid*, 192 F.3d 230, 238–9 (1st Cir.1999).

**29.** The December 26, 1990, arrest for illegal possession of a class B substance, Dorchester District Court (par. 30); the illegal possession of a class B substance less than one year later, February 27, 1991 (Par. 31), at or near the same spot, Dorchester District Court; then the unarmed robbery described above on April 13, 1992 (Par.32); possession with intent to distribute crack on January 6, 1994 (Par. 33), Dorchester District Court; the same charge, in virtually the same spot three months later on March 29, 1994 (Par. 34), Dorchester District Court; possession with intent to distribute crack and marijuana on May 23, 1997, same place, Dorchester District Court; distribution of class B in a school zone, on January 21, 1998, same spot (Par. 36), Dorchester District Court.

**30.** I had serious concerns that certain aspects of Mr. Dedrick's criminal record were counted wrong. First, since the initial charges initially spanned from 1992 until 1998, I was concerned that state convictions occurring within that time, for the same drug, in the same area, with the same codefendants, should have been considered part of the offense of conviction, as relevant conduct under U.S.S.G. § 1b1.3. While the defendant did not

plead to the conspiracy count, it was still the case that defendant could have been held responsible for his own acts during the conspiracy period. I was troubled that defendant's record appeared worse than it was, simply because the federal government opted to "let" the state authorities take charge of certain illegal activities, while they continued their investigation.

While treating the behavior underlying those convictions as relevant conduct would arguably *decrease* the criminal history score, and eliminate certain offenses which were considered predicates for the career offender status, it could *increase* the offense score (because additional drugs would be added to it, assuming the amount could be reconstructed).

However, under the Guidelines, offenses before April 1997 could not be considered "related," because they resulted in convictions and more importantly, sentences, which were imposed before the acts comprising the instant federal offense. See U.S.S.G. § 1B1.3. Commentary, Note 8. And, so long as they were "counted" they triggered treatment as a career offender.

For a related reason, these offenses could not be grouped together in the criminal history section either. In U.S.S.G. § 4A1.2, Commentary, the rule notes that "[p]rior sentences are not considered related if they were for offenses that were separated by an intervening arrest." *See* U.S.S.G. § 4A1.2, Commentary, Note 3.

downward departure on this basis was appropriate, but I also reviewed the presentence reports of others for whom judges of this Court decided to depart downward.[31] Two examples:

In *United States v. Augustine Vega*, No. 992–10358 (D.Mass. Nov. 30, 1993) Judge Zobel departed downward from a range of 188 to 235 months to 78 months because the defendant's criminal history substantially overstated his culpability, where that record included conviction for an armed robbery and assault with a dangerous weapon (tried in the Essex Superior Court), and larceny from the person, a far more violent record than Mr. Dedrick's.

In *United States v. Eugene Terrell Patrick*, No. 96–10047 (D.Mass. Feb. 26, 1999), Judge Keeton departed from 151 to 188 month range, two levels to sentence the defendant to 120 months. This was so even though Mr. Patrick had a juvenile record and as an adult, was convicted of multiple assault, larceny, and firearms offenses.

Indeed, counsel for the defense offered several other[32] presentence reports suggesting that judges of this Court have departed downward to eliminate disparities as among codefendants.

Accordingly, I departed downward one level, to 108 months.

**D.  *Credit for Discharged Term of Imprisonment***

■ The Guidelines expressly provide for credit for an undischarged term of imprisonment where "the undischarged term of imprisonment resulted from offense(s) that have been fully taken into account in the determination of the offense level for the instant offense." *See* U.S.S.G. § 5G1.3(b). But while U.S.S.G. § 5G1.3(b) refers to an "undischarged" term of imprisonment, Commentary, Note 2 of § 5G1.3 is phrased more generally: "When a sentence is imposed pursuant to subsection (b), the Court should adjust the sentence for any period of imprisonment already served as a result of the conduct taken into account in determining the Guideline range for the instant offense if the court determines that the period of imprisonment will not be credited to the federal sentence by the Bureau of Prisons." U.S.S.G. § 5G1.3, Commentary, Note 2. Significantly, such credit is not a departure from the Guidelines.

The purpose of these sections is to avoid double punishment for the same offense, to ensure flexibility and "reasonable punishment." U.S.S.G. § 5G1.3(c). Obviously, that purpose applies even when the state sentence has been served. As Judge Keeton noted in *United States v. Eugene Ter-*

---

**31.** I expressly made the criminal history sections of these reports available to the government and defendants.

**32.** For example (from defendant's brief):
Rosengard, Marc (O'Toole, J.)
Docket: 97–10334
Range: 41–51 months
Sentence: 33 months
Grounds: In order to provide a proportionality between this defendant and all other defendants in this act balance disposition on the case as a whole.
Date of Imposition: 6–17–99
Freeman, William (Young, J.)
Docket:98–10028
Charge: Witness Tampering
Range:10–16 months
Sentence: 4 months
Grounds: "I do depart downward one level by virtue of what appears to this Court to

be a disparity in the treatment between Mr. Freeman and Mr. Dibella."
Date of Imposition: 1–8–99
Aly, Abraham (Young, J.)
Docket:97–10313
Charge: Mail Fraud, Bribery
Range:15–21 months
Sentence: 12 months and $ 4000 fine
Grounds: "I've credited (time spent being evaluated) in imposing this sentence. Second … equity among defendants who are guilty of the same course of conduct is a significant criterion in sentencing, one that is not adequately taken up by the sentencing guidelines, and I believe I'm authorized to depart downward on these grounds. And lastly, I do believe that the health condition of Mr. Aly is delicate."
Date of Imposition: 11–18–98

*rell Patrick,* "I find that, in formulating U.S.S.G. § 5G1.3(b), the Sentencing Commission did not adequately take into account the discriminatory way in which the distinction between discharged and undischarged terms of imprisonment would operate." [33]

Simply put, credit for a state sentence imposed for the same conduct as the offense of conviction should not depend on the happenstance of the timing of the federal prosecution. If the state sentence was for the same conduct as the federal offense, it should be credited. *See United States v. Blackwell,* 49 F.3d 1232, 1240–42 (7th Cir.1995); *United States v. O'Hagan,* 139 F.3d 641, 656–658 (8th Cir.1998).

Mr. Dedrick was sentenced to 18 months for an offense committed on May 23, 1997, a month after the instant offense, in the same area, by the same arresting officers, involving the same drug. (Par. 35). Probation concluded that it was effectively part of the instant offense and added the quantity of drugs found on that occasion to the total offense of quantity. Mr. Dedrick served from May 8, 1998 to August 16, 1999, on these charges, before being released into federal custody. That time should be credited to the instant offense.

## IV. *MICHAEL CURRY—RELEVANT CONDUCT AND QUANTITY*

### A. *Background*

Michael Curry was named in seven counts of the indictment charging the distribution of 1 gram of crack of April 1, 1996, .09 grams on May 30, 1997, .52 grams on June 10, 1997, 1.2 and .99 grams on August 28, 1997.

His criminal history began when he was seventeen, and continued until his imprisonment on state, and now federal charges. While he had two prior drug convictions, and one conviction for a crime of violence, unlike Malcolm Dedrick, he just misses career offender status. Only one prior crime of violence "counted": One drug

conviction occurred when he was eighteen; the second was considered part of the instant offense—indeed, Count 8 of the superceding indictment. He has fewer offenses than does Malcolm Dedrick, but those that he has are violent—possession of guns, armed assault with intent to murder.

And his background is far less troubled than the other two. Curry was the second of five children, his parents staying together until he was five. While Curry's father moved out, he remained in touch. His family life appeared stable. At sixteen, he began to have difficulties with the law, a pattern which continued until the present. He has no mental disabilities or physical disabilities, and not much of an employment or educational record. He never went past the ninth grade. Because of the vagaries of the Guidelines—who makes career offender status, who does not—his sentence range was lower than Dedrick's.

### B. *Guideline Calculation*

#### *Quantity:*

From the counts of conviction: 1 gram of crack of April 1, 1996, .09 grams on May 30, 1997, .52 grams on June 10, 1997, 1.2 and .99 grams on August 28, 1997. The defendant was also held accountable for 1.2 grams since he was present on August 28, 1997, when Shawn Mells obtained that quantity of crack.

Defendant is also held accountable for offense conduct in paragraph 33 of the presentence report. It involves possession of crack with intent to sell in the same area, the same time, involving the same codefendants as in the instant federal offense. While that conduct, originally "counted" in the criminal history section, it is more appropriate to consideration as part of relevant conduct, increasing the total quantity of drugs attributable to Mr. Curry to between 4 and 5 grams. Thus,

**33.** Reported in the Probation Department's database of departures.

pursuant to U.S.S.G. § 2D1.1(c)(8) the base offense level is 24.

Under U.S.S.G. § 2D1.2(a)(2) because the defendant stipulated that the conduct at issue occurred within a school zone, one point is added, yielding 25. With a two point adjustment for acceptance of responsibility, the total is 23.

*Criminal History:*

Curry's criminal history is a Level V for a Guideline range of 84 to 105 months.[34]

Giving Mr. Curry credit for related state charges for which he has been incarcerated since September 29, 1997, yields a sentence of 75 months on each of the counts to be served concurrently with each other and with the state court sentence the defendant is now serving, without departure. In addition, I imposed six years of supervised release.

**SO ORDERED.**

---

**34.** When the offense in paragraph 33 was considered part of the criminal history, additional points were added under U.S.S.G. § 4A1.1(d) and (e) because the defendant committed the instant offense less than two years after release from imprisonment on that sentence, and while on probation. That enhancement is still appropriate even though the offense in paragraph 33 was considered part of relevant conduct. The instant offense is still within two years of Mr. Curry's 1994 conviction.