**UNITED STATES of America,**

v.

**Jeremy D. WOODLEY, Defendant.**

**No. CRIM.03–10135–NG.**

United States District Court,
D. Massachusetts.

Oct. 29, 2004.

mental illness. Homeless between the ages of 19 and 23, he was in and out of various houses of correction for a series non-violent district court-based drug and property crimes. While his institutional record during these prior incarcerations was not good, his current detention showed a fundamental change. Not only were there no disciplinary violations, but Woodley volunteered to lecture and work with troubled teenagers in a program known as Project Alert, to get them to avoid the mistakes he had already made in his young life. He had never done anything that constructive before in his life.

Woodley's proposed Guideline sentence would reflect none of these issues—the context of his prior offenses, his addiction, his mental illness, or his current attitudinal changes. The relevant Guideline "score" is almost entirely driven by Woodley's criminal record and the career offender provision of U.S.S.G. § 4B1.1.[2] As a career offender, U.S.S.G. § 4B1.1 directs that the offense level be set at or near 32 (minus 3 for acceptance of responsibility), and the criminal history be counted at the highest level, a category VI. The resulting range would be 151—188 months—this for a 23 year old homeless, troubled addict who had never served more than a year in a house of correction. Without the career offender enhancement, Woodley's sentence would have been in the range of 77—96 months.

The defense has moved for a downward departure under U.S.S.G. § 4A1.3 on the ground that the defendant's criminal histo-

Paul R. Moore, United States Attorney's Office, Nadine Pellegrini, United States Attorney's Office, Boston, MA, for USA, Plaintiff.

John H. Cunha, Jr., Cunha & Holcomb, PC, Boston, MA, for Jeremy D. Woodley, Defendant.

## SENTENCING MEMORANDUM

GERTNER, District Judge.

Jeremy D. Woodley ("Woodley") was charged with bank robbery in a one count indictment alleging a violation of 18 U.S.C. § 2113(a). The indictment claims that Woodley took approximately $738.00 from the Citizen's Bank in Boston, Massachusetts.[1]

At 23, Woodley had been a drug addict since his early teens, and with documented

---

1. This sentencing took place prior to the United States Supreme Court's decision in *Blakely v. Washington. Blakely,* —— U.S. ——, 124 S.Ct. 2531, 159 L.Ed.2d 403 (2004). The analysis on which the sentencing was based was entirely determined by the United States Sentencing Guidelines in effect at the time.

2. Section 4B1.1 is applicable if 1) the defendant was at least 18 years old at the time he committed the offense of conviction; 2) the offense of conviction is a felony that is either a crime of violence or a controlled substance offense; and, 3) the defendant has at least two prior felony convictions of either a crime of violence or an applicable controlled substance offense.

ry vastly overstated his culpability and based on his extraordinary rehabilitation, U.S.S.G. § 3E1.1 cmt. (n. 1.)(g) (listing "post offense rehabilitative efforts e.g., counseling or drug treatment" as considerations in granting an acceptance of responsibility credit).

I agreed and granted the downward departure on both grounds to a criminal history category IV, and an offense level of 25. The resulting range was 84—105 months. I sentenced Woodley to 84 months with a judicial recommendation that the defendant participate in the 500 hour comprehensive drug treatment program, as well as a mental health treatment program. In addition, the defendant was sentenced to three years of supervised release during which time he was to continue his treatment for substance abuse and mental illness.

Nothing about this case reflects the kinds of concerns that Congress had expressed in enacting the career offender provisions. Everything about this case cries out for an extraordinary rehabilitation departure, and a departure based on criminal record.

## I. BACKGROUND

### A. Nature of the Offense

The idea of this offense was hatched in a spur of the moment. On March 26, 2003, Woodley was driving around with two other individuals, a female named Lacresha Edgerly and a male, Glenwood Swain. Suddenly, Woodley asked the driver, Edgerly, to stop the car. Swain was on the phone at the time; he was standing by the side of the car to let Woodley out. Woodley entered a Citizen's Bank at 441 West Broadway at 9:24 a.m. He rushed back into the car clutching a package from the bank; the bank's dye pack detonated the moment he reached the car. He ordered Edgerly to drive, leaving Swain standing where the car had been, still on the phone.

Inside the bank, Woodley stood in line and handed the teller a hand written demand note, reading "[g]ive me money or you get shot." Despite the language on the note, Woodley had no weapon. He grabbed $738.00 in United States currency, which was covered in red dye within minutes.

Witnesses at the scene noted the license plate number, the make and model of the car, and Woodley's description. The police traced the car to Edgerly, and through Edgerly, to Swain. They advised that Woodley had a girlfriend named Alicia who was hospitalized.

On March 26, 2003, an individual identifying himself as "Jeremy Woodley" called the Boston field office of the Federal Bureau of Investigation and stated that he wanted to turn himself in for the robbery he had committed in South Boston earlier in the day. He said he would wait at that address for members of the task force to arrest him. When the agents arrived, however, they found no one home. At the last minute, Woodley reported, he panicked, worried about the impact of the latest offense in light of his criminal record.

He did not go far. On March 30, 2003, the FBI found Woodley at Beth Israel hospital visiting his girlfriend. He confessed his own guilt and exculpated Edgerly and Swain.

## II. CRIMINAL HISTORY DEPARTURE

Recognizing the inadequacies of the criminal history scoring system, the Sentencing Commission encourages departures where "reliable information" indicates that the criminal history category "significantly over-represents the serious-

ness of a defendant's criminal history or the likelihood that the defendant will commit further crimes."[3]   U.S.S.G. § 4A1.3(a)(1).

Significantly, to qualify for this departure, unlike departures in Chapter 5 (specifically § 5K2.0 of the Guidelines manual) the Court does not have to find that there is something atypical or unusual about the defendant's record.[4]   The statutory authority for U.S.S.G. § 4A1.3 lies not in 18 U.S.C. § 3553(A)(7)(b), the departure authority, but "in the basic provision of the Sentencing Reform Act that gives the Commission the authority . . . to take into account, where relevant, the defendant's criminal background," *United States v. Shoupe*, 988 F.2d 440, 446 (3rd Cir.1993); *United States v. Lacy*, 99 F.Supp.2d 108, 121 n. 28 (D.Mass.2000); *United States v. Wilkerson*, 183 F.Supp.2d 373, 379 (D.Mass.2002); *United States v. Ham-*

*mond*, 240 F.Supp.2d 872, 874 (E.D.Wis. 2003).[5]   Moreover, this departure is also available to individuals who otherwise qualify for career offender status. *Lacy*, 99 F.Supp.2d at 120.[6]

Obviously, a judge should not make a departure determination based on criminal record out of thin air. Rather, he or she must analyze the purpose of the criminal history scoring, its structure and its limitations, and then determine where this defendant's record fits within it: The purpose of the criminal history provisions is "to provide harsher sentences for those with a prior record of misconduct, general deterrence of crime, and protection of the public from criminal recidivists." *See Hammond*, 240 F.Supp.2d at 877; U.S.S.G. § 4A (introductory commentary); *see also* Freedman, *supra*, at 312 (stating that the Commission devised the criminal history axis to provide for "just desserts"

---

**3.**   As Judge Adelman noted in *United States v. Hammond*, 240 F.Supp.2d 872, 876 (E.D.Wis. 2003):

This is so because the Commission has recognized the inherent limitations in the mathematical approach to criminal history it has adopted. See U.S.S.G. § 4A1.3 (background commentary) ('[T]he criminal history score is unlikely to take into account all the variations in the seriousness of criminal history that may occur') . . . . Therefore, the Commission has provided district courts with specific authority to make 'adjustments' in the criminal history category based only on 'reliable information.' The information need not be sufficient to take the case out of the 'heartland' of cases— only 'reliable'—and indicative of either (1) a significant over-representation of the seriousness of the defendant's criminal history or (2) the likelihood that the defendant will commit further crimes.   U.S.S.G. § 4A1.3(b)(1).

(footnotes omitted).

Indeed, the Third Circuit has suggested that the Commission could have labeled § 4A1.3 an "adjustment" provision rather than a "departure" provision. *United States v. Shoupe*, 988 F.2d 440, 445 n. 7 (3d Cir.1993).

**4.**   The Court does not have to find that "there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission." 18 U.S.C. § 3553(b)(1); *see also United States v. Wilkerson*, 183 F.Supp.2d 373, 380 (D.Mass.2002).

**5.**   Discretion here is indeed broad, broader than elsewhere in the Guidelines. *See* Spencer Freedman, *In Defense of Criminal History Departures*, 13 Fed. Sent. R. 311, 313 (May/June 2001) ("In promulgating § 4A1.3, the Commission established an enormous reservoir of judicial discretion to achieve the purposes of sentencing . . .").

**6.**   *See* Michael S. Gelacak, Ilene H. Nagel, and Barry L. Johnson *Departures Under the Federal Sentencing Guidelines: An Empirical and Jurisprudential Analysis*, 81 Minn. L.Rev. 299, 356 (December 1996) (noting the "extensive use of departures from sentences generated by career offender provisions"). Moreover, because the career offender provisions require a sentence at or near the maximum term authorized, the resulting departures were often quite substantial. *Id.* at 357.

to recidivists and incapacitation for crime control purposes). Put otherwise, I am to ask: Does this record suggest that likelihood of recidivism? What does the record teach about the offender's criminal background and thus the punishment he deserves, relative to other information available to the Court? And in this case, how does the record compare to that of other career offenders? What impact would this sentence have on similarly situated offenders?

Obviously, the analysis starts with a review of Woodley's record, and how his score reached the highest level. My general methodology in this regard derives directly from the Guideline text. *See United States v. Footman*, 66 F.Supp.2d 83 (D.Mass.1999), *aff'd*, 215 F.3d 145 (1st Cir.2000)(upward departure):

> ... [W]hat is it about the [criminal history] score which created the under or over valuation of the record?
>
> > i) prior sentences not counted in computing criminal history (e.g. foreign sentences), ii) prior sentences of 'substantially more than one year' that derive from independent crimes on different occasions, *see* § 4A1.3(a) and (b); iii) the timing of convictions—did they follow closely one after another or while another charge was pending? *see* § 4A1.3(d) and iv) the nature of the conviction—e.g., assaultive behavior or non-violent conduct.

*Id.* at 99; *see also United States v. Leviner*, 31 F.Supp.2d 23 (D.Mass.1998)(downward departure).

To that list I add the following: the length of prior sentences—were they just long enough to trigger two points under the Guidelines or in fact much longer?

*See Hammond*, 240 F.Supp.2d at 879; *Wilkerson*, 183 F.Supp.2d at 381.[7] A defendant's record could climb to a high criminal history category merely by virtue of a combination of jail sentences that were just long enough to trigger "counting" under the Guidelines. And that record would hardly be comparable to that of an offender who reached the same point through a single lengthy prison term. As I noted in *Leviner*:

> To treat this man [Leviner] as if he were only a point on a grid... would do violence to the purposes of the Sentencing Guidelines. It would treat someone convicted of Felon in Possession of a Firearm [the defendant's conviction] with a minor record, solely because he had a few sentences in the criminal history (1), (2), and, (3) range, the same as someone with multiple, violent crimes, and multiple ten to fifteen year sentences. It would create a new form of disparity, treating offenders that are completely different in a like way.

*Id.* at 33.

In addition, I will consider: Was the defendant given relatively lenient sentences even after his recidivism? *See Hammond*, 240 F.Supp.2d at 880. That pattern could either reflect the fact that other judges did not fully appreciate defendant's dangerousness or that other judges appropriately recognized this man's capacity to change. How close in time were the prior offenses—were they part of a single crime spree during a finite period of distress, rather than reflecting a life of crime? *Id.* at 880. And, significantly, were they for violent or non-violent conduct. The Guidelines do not make any distinction between violent crimes and non

---

**7.** As I noted in *Leviner*: "The current system scores convictions based on the length of the sentence imposed for the offense. Prior sentences of more than thirteen months receive three points, sentences between six and thirteen months receive two points, and those of less than six months receive one point. *See* § 4A1.1." 31 F.Supp.2d at 32.

violent crimes. An individual who received an eighteen month term for possession with intent to distribute drugs would get the same score as someone who received an eighteen year sentence for murder.

Criminal history departures also permit a court to put the defendant's record in the context of his life and background. For example, notwithstanding the Guidelines prohibition on considering the defendant's age in evaluating the appropriate sentence (in U.S.S.G. § 5H1.1), when the Guidelines address criminal history, the commentary suggests that the age of the defendant at the time of various offenses is one of the factors the court could balance in evaluating adequacy of the score. *See Wilkerson,* 183 F.Supp.2d at 380. Other judges have considered the relationship between the specific offenses and drug use, notwithstanding the provisions of U.S.S.G. § 5H1.4. *See United States v. Hammond,* 37 F.Supp.2d 204, 205 (E.D.N.Y.1999).

Applying these principles to Woodley, I find the following:

Woodley was born on October 25, 1980, to Fred Woodley and Donna Lane who were never legally married. He was raised by his father and lived in various apartments around the south end of Boston. He was never permitted to live with his mother, who was a documented schizophrenic. She tried to stab him when he was just a baby. While Woodley grew up visiting his mother and her side of the family, and was close to several aunts, uncles, and cousins, his father was "everything" to him. P.S.R. ¶ 63.

In 1990, when Woodley was 10 years old, his father was struck and killed by a commuter rail train. P.S.R. ¶ 66. At that time, he had been living in his paternal grandmother's apartment with his father. *Id.* With his father's death, the defendant began to have problems both at home and at school. *Id.* After a brief period of time living with another set of relatives in Silver Springs, Maryland, the defendant moved back to Boston and his grandmother's apartment. P.S.R. ¶ 67. In and out of the custody of the Department of Youth Services ("DYS"), at age 14 he was committed to the Taylor Manor Mental Health Center because he was suicidal. P.S.R. ¶ 79. He was discharged with the diagnosis of depression, suicidal ideation, and feeling of hopelessness. P.S.R. ¶ 83A.[8] Although his prognosis was "guarded," he was released without medication.

As noted in records from the Brighton Treatment Center in 1997, he "was able to consistently contract for safety but made it clear that he felt as if he cared about little and felt hopeless." P.S.R. ¶ 83F. His therapist stated, "forgotten and kicked around [the defendant] has almost developed the belief that he is impervious to assistance and more importantly not worth the effort." P.S.R. ¶ 83H.

In 1999, Woodley, now 19 years old, lost the second bulwark of his life, his grandmother. P.S.R. ¶ 71. As one relative reported to probation, "Jeremy is a good kid, he just had no one who was there for him. He did have his father and his grandmother, and when he lost them, all hell broke loose." P.S.R. ¶ 69.

He had no permanent address, he lived where he could, with whomever he could. As he described to probation, "jail is like home to me," essentially, "second nature." P.S.R. ¶ 71. He sold drugs to survive. In 1999, he was put on medication for depression and to control psychotic symptoms.

---

8. He was described as having "auditory, visual, olfactory, gustative, and tactile hallucinations." P.S.R. ¶ 81.

He heard voices that told him he was "scum." Finally, he was diagnosed as psychotic. P.S.R. ¶ 84.

All of the offenses which form the predicate for the career offender status and yield the defendant's criminal history score were committed during this period of time, when he was homeless, addicted, and mentally ill.

### A. *1999*

Woodley earned six points in that chaotic time in 1999. On April 17, 1999, he was charged with breaking and entering in the daytime and other charges largely stemming from a fight. P.S.R. ¶ 40. The case was continued without a finding until July 6, 2001. His probation officer stated that he reported continuously but was constantly being picked up on new charges. *Id.* He was, she concluded, a "very intelligent guy with a drug problem." *Id.*

On July 19, 1999, Woodley was arrested in the theater district of Boston, this time for possession with intent to distribute crack cocaine. P.S.R. ¶ 41. Because of the location of his arrest—it was, as is most of Boston—within 1,000 feet of a school zone. He was charged with the more serious offense of distribution of drugs within a school zone.

While awaiting trial on this drug transaction and the probation violation (deriving from his initial breaking and entering charge in April of 1999), Woodley was arrested on October 21, 1999, for receiving a stolen vehicle. P.S.R. ¶ 42. The combination of these 3 offenses, all occurring in close proximity to one another led him to be sentenced to six months in a house of correction (one probation violation, the drug offense, and the receiving a stolen

vehicle offense). And because the offenses took place while he was on probation, or bail, the criminal history score was increased still further under U.S.S.G. § 4A1.2(k). He was released in May of 2000.

### B. *2000*

He still had no place to go. In short order he was in trouble again, this time for shoplifting and possession of crack cocaine. P.S.R. ¶ 43. Given his addiction and his homelessness, it was not a surprise that he was arrested, because he was "known to the officers for having been involved in drug activity in the past" and was found in an "area known for a high level of drug activity," he was stopped again. P.S.R. ¶ 44. The defendant was charged with possession with intent to distribute cocaine, again within 1,000 feet of a school.[9] Woodley was sentenced to nine months in a house of correction and released on March 14, 2001.

### C. *2001*

Again, his release was followed by two stolen car offenses. P.S.R. ¶¶ 45 & 46. This time, however, something truly snapped. Woodley attempted to commit suicide while in a holding cell in Area D4. P.S.R. ¶ 46. The police incident report shows that Woodley was hanging by his cell door frame by his shirt, which was tied around his neck. He was only 20 years old.

Originally given a suspended sentence, he served six months on these offenses because he simply could not stop taking drugs and selling them to support his habit.

---

9. A frisk of the defendant revealed that he was in possession of a Swiss Army knife, which led to the charge of "unlawfully carrying a dangerous weapon while on probation." P.S.R. ¶ 44.

In June of 2001, he was arrested for possession with intent to distribute marijuana, again within 1,000 feet of a school zone. P.S.R. ¶ 47. A month later he was charged with possession of burglar's tools, another stolen car charge, and carrying a dangerous weapon—the Swiss Army knife. P.S.R. ¶ 48. The combination of charges lead to an additional one year committal to a house of correction. On September 23, 2003 the defendant was released.[10] This offense followed seven months later.

■ It is clear that a criminal history score of 16 and a category of VI vastly overstates Woodley's criminal culpability, and as such leads to a result beyond what "just deserts" requires. Criminal History VI is the highest category assigned under the federal Guidelines. It includes individuals with a record for murder, or rape. It includes offenders with multiple violent encounters and lengthy state prison terms.

Woodley's offenses were all non-violent, and the sentences were short, in houses of correction, not state prison. It is the record of a deeply troubled young man whose mental illness and addictions were never addressed. As Dr. Hardman, M.D., noted, Woodley's pattern of substance abuse is one of self medication: He took the drugs and alcohol to help him cope with deeper mental health problems, such as psychosis and depression. Letter from George L. Hardman, M.D., Psychiatrist, to John H. Cunha, Jr., Attorney, Cunha & Holcomb, PC, 6 (Dec. 24, 2003) submitted with Defendant's Motion for Downward Departure. None of this excuses Woodley's conduct: it only suggests that the mathematical category on the grid into which he supposedly fits makes no sense.

This is the record of a drug addict, as Judge Weinstein described in *United*

*States v. Hammond*, 37 F.Supp.2d 204 (E.D.N.Y.1999): "His prior arrests resulted from minor drug crimes involving facilitation of the sale of drugs and the kind of petty criminality associated with a poor addict's attempt to acquire money for the purchase of narcotics." *Id.* at 205. "Unlike more affluent people with a cocaine habit," the court notes, "Mr. Hammond's relatively menial employment could not support both his drug dependency his family." *Id.; see also United States v. Rivers,* 50 F.3d 1126, 1131 (2nd Cir.1995); *United States v. Rogers,* 972 F.2d 489, 494 (2nd Cir.1992).

Moreover, Woodley's case is substantially different from the cases before the First Circuit, notably, *United States v. Gendraw,* in which the defendant had numerous convictions for assault and battery, etc.. 337 F.3d 70, 72 (1st Cir.2003). Likewise, in *United States v. Mayes,* the defendant was also involved in an armed assault, ostensibly placing him within the heartland of career offenders. 332 F.3d 34, 37–38 (1st Cir.2003). Woodley's record fits squarely into the kind of record for which other judges of this Court have departed downward. *See Lacy,* 99 F.Supp.2d at 123–124 (citing instances of downward departure by judges of the District of Massachusetts).

As for the likelihood that Woodley would be a recidivist, that depends entirely on whether or not the underlying drug and mental health problems are addressed. Although he took part in some substance abuse therapy from the Department of Youth Services, the agency's records do not indicate that a recommended psychiatric consultation ever occurred. While he received medication at South Bay House of Correction to control his psychosis and deep depression, Dr. Hardman believes

10. There is a pending charge dating from March 3, 2003, for carrying a dangerous weapon. P.S.R. ¶ 55. That weapon was determined to be a $CO_2$ air gun.

Woodley was "subtly discouraged" from taking the medication. Letter from Hardman to Cunha at 6. As he reports, "Being on psychiatric medication apparently meant that [Woodley] could not be in the general population. It has been my experience, having worked in correctional settings in the past, that such polices may induce inmates to minimize psychiatric symptoms to avoid loss of privileges." *Id.* And these failures apparently continued even after his 2001 suicide attempt.

It is one thing to predict recidivism in the case of an offender who got the benefit of both punishment and treatment for drug addiction and persisted in committing crimes. It is quite another thing to predict recidivism for someone whose severe mental problems and drug addiction were never treated.

### D. *Extraordinary Rehabilitation*

The defendant moves for a departure based upon his extraordinary post defense rehabilitation. To be sure, the defendant recognizes that the First Circuit has narrowed this category to a considerable degree. In *United States v. Craven,* this Court held that "[t]he touchstone of extraordinary rehabilitation is a fundamental change in attitude." 239 F.3d 91, 100 (1st Cir.2001).

Such fundamental changes occurred, for example, in *United States v. Bradstreet* when, after sentencing, a defendant began tutoring other prisoners, teaching adult education classes in prison, serving as a prison chaplain's assistant and the clerk of a prison parenting program. 207 F.3d 76 (1st Cir.2000); *see also United States v. DeShon,* 183 F.3d 888 (8th Cir.1999) (defendant radically altered his life, attending church four times a week, receiving counseling and working over seventy hours a week to catch up on his bills). Likewise, in *United States v. Perella,* this Court

found that the defendant had exhibited extraordinary rehabilitation when, after struggling with drug addiction and numerous relapses, his attitude changed suddenly. 273 F.Supp.2d 162 (D.Mass.2003). He began attending alcoholics and narcotics anonymous meetings, and other therapy sessions, five times a week, as well as helping other addicts and lecturing young people about the risks of substance abuse. *Id.* at 163. The defendant went beyond merely rehabilitating himself, but reached out to others to share his experiences with them and to try to deter them from doing the same thing.

Like Perella, Woodley volunteered in Project Aware, a program that gives him an opportunity to interact with children visiting the jail and to "tell them that jail is no place for them." He gives the children tours of the prison and tells them about prison life. And as he noted in his statement to the Court, he saw his "soul" in these children. They came from "broken homes, they see people get money for selling drugs, it is appealing." He wanted to let them know that he "wouldn't wish [his] situation on [his] worst enemy." Finally he told the Court he participated in Project Aware because [he] felt like [he] was giving back something by talking to the kids, that he would feel rewarded if he could affect just one of them. In short, his record at Wyatt exemplified the selfless behavior which the Court looks to as a sign of sincere change. *See Perella* at 167 (classifying voluntary efforts to not only rehabilitate one self but also to zealously help others as "rehabilitation plus.")

Moreover, unlike the defendant in *Craven,* there has been no backsliding here. Whereas in the past, Woodley's institutional record was filled with non-compliance and minor disciplinary charges, it has been perfect since his arrest. He participates in the interpersonal violence program,

which helps inmates manage their anger; he voluntarily attends narcotics anonymous meetings on a regular basis and acknowledges that his substance abuse problem accounts for much of his criminal behavior. He is taking educational courses, such as history, algebra and economics to remedy the opportunities he either squandered or was not given as a youth. In short, the institutional record that he presents today is "fundamentally" different from the institutional record he had developed in the past.

During his presentence investigation interview, Woodley told the probation officer "I have no one to blame but myself," and even indicated that he "wanted to apologize to the teller." Nothing that Woodley has done since his arrest suggests that his efforts are an attempt to deceive the Court or are even motivated by an effort to prevent lengthy punishment. He began on this track almost immediately after the robbery for which he was charged. He has never come this far before.

Accordingly, in addition to the departure to a category 4 on criminal history, I departed to a level 25 from an offense level of 29. I would not go below the Guideline range to which Woodley would be subject were he not a career offender. In other words, the Court recognizes that Congress intended to enhance a career offender's punishment beyond that of the ordinary defendant. Taking that into account, I sentenced Woodley to 84 months.

**SO ORDERED.**